Crosby Wilfredo ORANTES–
HERNANDEZ, et al.,
Plaintiffs,

v.

Alberto R. GONZALES, Attorney
General of the United States,
et al., Defendants.

No. CV82–01107–MMM(VBKX).

United States District Court,
C.D. California.

July 24, 2007.

Karen C. Tumlin, Linton Joaquin, National Immigration Law Center, Mark D. Rosenbaum, Ranjana Natarajan, ACLU Foundation of Southern California, Los Angeles, CA, for Plaintiffs.

Frank Michael Travieso, John E. Nordin, II, AUSA–Office of US Attorney, Civil

Division, Los Angeles, CA, Victor M. Lawrence, Office of U.S. Immigration Litigation, Civil Division U.S. Department of Justice, Washington, DC, for Defendants.

AMENDED ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISSOLVE THE ORANTES INJUNCTION

MORROW, District Judge.

## I. PROCEDURAL BACKGROUND

Plaintiffs filed this action in 1982, challenging practices and procedures allegedly employed by the Immigration and Naturalization Service ("INS") to detain, process and remove Salvadoran nationals who had entered the United States. Plaintiffs sued on their own behalf and on behalf of a class of "all citizens and nationals of El Salvador eligible to apply for political asylum ... who ... have been or will be taken into custody ... by agents of the [Department of Homeland Security]." *Orantes–Hernandez v. Meese,* 685 F.Supp. 1488, 1491 (C.D.Cal.1988) (*"Orantes II "*), aff'd., 919 F.2d 549 (9th Cir.1990). Judge David Kenyon certified the *Orantes* class on April 30, 1982.[1]

On April 29, 1988, Judge Kenyon entered a permanent injunction mandating that the INS use specific procedures when detaining, processing and removing Salvadoran immigrants. See *Orantes II,* 685 F.Supp. at 1511–13. On July 2, 1991, he modified the injunction to add four conditions that applied solely to the Port Isabel Service Processing Center in Port Isabel,

Texas (*"Orantes* injunction"). On September 28, 2004, the court entered a stipulated order clarifying the terms of the injunction to eliminate the possibility that the Office of Refugee Settlement could be held to be in violation of its terms.[2]

On November 28, 2005, the government filed a motion to dissolve the injunction. It asserted (1) that there had been a significant change in the factual circumstances that led to issuance of the injunction—i.e., the end of the civil war and attendant human rights abuses in El Salvador, and the adoption of a range of procedures by U.S. immigration authorities that ensure that aliens are advised of their right to apply for asylum and are not coerced into waiving that right; and (2) that there had been an intervening change in law—i.e., the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which provides for expedited removal of inadmissible aliens. As respects the intervening change in law, the government argued that the injunction conflicted with IIRIRA and the regulations governing expedited removal, and also that the injunction made it burdensome for immigration authorities to place Salvadorans in expedited removal. The court bifurcated this issue, and heard the government's argument regarding the purported facial conflict in September 2006. Following the hearing, it issued an order modifying paragraphs two and eleven of the injunction. The parties argued the balance of the government's reasons for seeking dissolution of the injunction on

---

1. The original class certified by Judge Kenyon encompassed not only Salvadorans who had been or would be in custody and were eligible to apply for political asylum, but also Salvadorans who, subsequent to June 2, 1980, requested, or would in the future request, political asylum, and whose claims had not yet been presented or adjudicated. See *Orantes–Hernandez v. Smith,* 541 F.Supp. 351, 355 (C.D.Cal.1982) (*"Orantes I "*). Plaintiffs later abandoned claims on behalf of the second group of Salvadorans. *Orantes II,* 685 F.Supp. at 1491.

2. The Office of Refugee Settlement is an agency responsible for the care of unaccompanied alien children who are in federal custody due to their immigration status.

December 20, 2006. This order addresses those arguments.

## II. DISCUSSION

### A. Legal Standard Governing Dissolution Of An Injunction

Until 1992, courts asked to dissolve existing injunctions applied a standard first articulated in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). *Swift* was the culmination of a government antitrust action against the meat-packing industry. The government alleged that defendants had suppressed competition in the purchase of livestock and sale of dressed meats, and that, having eliminated competition in meat products, they had also suppressed competition in the sale of other products, such as fish, vegetables, fruit and groceries. *Id.* at 110, 52 S.Ct. 460. In 1920, defendants agreed to a consent decree that banned them, *inter alia*, from owning retail meat markets or stockyards, and from manufacturing, selling, or transporting 114 varieties of foodstuffs. *Id.* at 111, 52 S.Ct. 460. Ten years later, five meat packers petitioned for modification of the decree, arguing that conditions in the meat-packing and grocery industries had changed. *Id.* at 113, 52 S.Ct. 460. The lower court modified the injunction to permit the meat packers to sell groceries and other commodities at wholesale, but retained the ban on retail sales of such products. *Id.* at 113–14, 52 S.Ct. 460.

An appeal followed. The Supreme Court framed "the question [that had to be resolved as] whether [a modification could] be made without prejudice to the interests of the classes whom th[e] particular restraint was intended to protect." *Id.* at 117–18, 52 S.Ct. 460. It answered this inquiry in the negative, noting that industry changes had reduced the likelihood that defendants would once again monopolize the sale of meats, but that the changes

had not substantially reduced the possibility that there would be antitrust violations in the sale of other food products if the injunction were dissolved. *Id.* at 117–18, 52 S.Ct. 460. The Court's conclusion was reinforced by evidence that there had been sporadic instances of unfair practices by the meat packers even after the monopoly was broken and the consent decree entered. *Id.* at 118, 52 S.Ct. 460. It cautioned: "Nothing less than a showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." *Id.* at 119, 52 S.Ct. 460.

The "grievous wrong" language in *Swift* worked an "apparent hardening of the usual standard for modifying decrees of injunctive relief." *New York States Ass'n for Retarded Children Inc. v. Carey*, 706 F.2d 956, 968 (2d Cir.1983). As a result, courts often held that modification or dissolution of an injunction was not warranted unless the party requesting relief could show a "grievous wrong"—a nearly insurmountable standard that "ward[ed] off virtually all efforts to modify consent decrees." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 379, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992); see also *United States v. City of Chicago*, 663 F.2d 1354, 1359 (7th Cir.1981) (noting that "numerous cases have mechanically employed the *Swift* 'grievous wrong' test, thereby suggesting that hardship to the defendant is the sole touchstone for modification of an injunction").

Under the "grievous wrong" standard, a party seeking modification or dissolution of an injunction had to meet a heavy burden of proof that often exceeded the burden imposed on parties seeking an injunction in the first instance. See *Swift*, 286 U.S. at 119, 52 S.Ct. 460 ("We are not framing a decree. We are asking our-

selves whether anything has happened that will justify us now in changing a decree.... The inquiry ... is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow"); *Ruiz v. Lynaugh*, 811 F.2d 856, 860–61 (5th Cir.1987) (noting that "modification is only cautiously to be granted; that the dangers which the decree was meant to foreclose must almost have disappeared; that hardship and oppression, extreme and unexpected, are significant; and that the movant's task is to provide close to an unanswerable case").

Subsequent Supreme Court cases, however, emphasized that courts had "misconceived the thrust" of *Swift* by focusing rigidly on the "grievous wrong" language. See *Board of Ed. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 246–48, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) (rejecting the rigid use of *Swift*'s "grievous wrong" language as the basis for denying a motion to dissolve a desegregation decree); *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968) (noting that the district court had misconceived the "thrust of this Court's decision in *Swift*," and stating the "*Swift* teaches that a decree may be changed upon an appropriate showing, and it holds that it may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved").

In *United Shoe Machinery*, the government sought modification of an injunction, claiming that additional relief was needed to fulfill the "purposes of the litigation." The district court denied the request, reading *Swift* as limiting modification to cases involving "(1) a clear showing of (2) grievous wrong (3) evoked by new and unforeseen conditions." *United States v. United Shoe Machinery Corp.*, 266

F.Supp. 328, 330 (D.Mass.1967). The Supreme Court held that this interpretation was too rigid, and noted that *Swift*'s reference to a "grievous wrong" had to be read in context. Because the original injunction had resulted in little progress toward the accomplishment of the decree's goals, the Court concluded that modification would promote, not subvert, the "purposes of the litigation." *United Shoe Machinery*, 391 U.S. at 248–49, 88 S.Ct. 1496.

In the 1980's, courts increasingly adopted a more flexible approach to requests for modification or dissolution of injunctions, particularly in institutional reform cases. See *Carey*, 706 F.2d at 970 (stating that the "grievous wrong" language of *Swift* did "not provide the proper standard to apply to injunctions entered in school desegregation cases [because s]uch decrees, unlike the one in *Swift*, are not intended to operate in perpetuity"); *City of Chicago*, 663 F.2d at 1360 ("The standard for modification of injunctions that emerges from *Swift* and *United Shoe* is ... not based solely on hardship to the enjoined party. The standard also incorporates consideration of whether there remains any need to continue the injunction, that is, whether 'the purposes of the litigation as incorporated in the decree' have been achieved"); *Newman v. Graddick*, 740 F.2d 1513, 1520–21 (11th Cir.1984) (explaining that *Swift* involved "rights fully accrued upon facts nearly impervious to change," and thus that the Court required a showing of a "grievous wrong evoked by new and unforeseen conditions," and stating that "[w]here ... a consent decree involves the supervision of changing conduct or conditions ..., modification may be more freely granted"); *Nelson v. Collins*, 659 F.2d 420, 424 (4th Cir.1981) (noting that the Court in *Swift* distinguished between situations in which a "continuing decree [was] directed to events to come ... (involving) the supervision of changing

conduct or conditions" and one in which an "injunction [was] granted to protect rights 'fully accrued upon facts so nearly permanent as to be substantially impervious to change,'" and observing that "[i]n the first case, modification under appropriate circumstances is clearly permissible [while] in the second [the "grievous wrong"] standard ... applied"); see also *Philadelphia Welfare Rights Organization v. Shapp*, 602 F.2d 1114, 1120–21 (3d Cir.1979) (noting that "[t]he modifications [sought did] not leave class members open to the evils to which the lawsuit was first addressed"); *Benjamin v. Malcolm*, 564 F.Supp. 668, 686 (S.D.N.Y.1983) (stating that "[t]he critical question on a motion to modify a decree is whether the proposed modification is 'in derogation of the primary objective of the decree,'" quoting *New York Association for Retarded Children*, 706 F.2d at 969 (Friendly, J.)).

In *Rufo*, the Court expressly approved this movement toward flexibility, noting that the "grievous wrong" language in *Swift* did not represent "a hardening of the traditional flexible standard for modification of [injunctions]." *Rufo*, 502 U.S. at 379, 112 S.Ct. 748. As evidence of this, the Court cited the statement in *Swift* that entering into a consent decree "was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be." *Id.* (quoting *Swift*, 286 U.S. at 114–15, 52 S.Ct. 460). As a result, the Court rejected the argument that Rule 60(b)(5)—which permits courts to modify or dissolve injunctions when "it is no longer equitable that the judgment should have prospective application"—codified *Swift*'s grievous wrong standard. Rather, the Court stated, Rule 60(b)(5) embodies "a less stringent, more flexible standard." *Id.* at 380, 112 S.Ct. 748.

▮ Under *Rufo*, "a party seeking modification of an [injunction] may meet its initial burden by showing a significant change either in factual conditions or in law." *Id.* at 384, 112 S.Ct. 748; see also *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir.2000) ("A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction"). If the moving party meets this burden, "the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo*, 502 U.S. at 383, 112 S.Ct. 748. Modification may be warranted "when changed factual conditions ma[k]e compliance ... substantially more onerous, ... when an [injunction] proves to be unworkable because of unforeseen obstacles, ... or when enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384, 112 S.Ct. 748.

Applying this "flexible" Rule 60(b)(5) standard, the Ninth Circuit has directed courts to "take all the circumstances into account in determining whether to modify or vacate a prior injunction or consent decree." *Bellevue Manor Associates v. United States*, 165 F.3d 1249, 1256 (9th Cir.1999); but see *United States v. Asarco Inc.*, 430 F.3d 972, 982 (9th Cir.2005) (noting that *Bellevue* did not announce a "totality of the circumstances test" for modification under Rule 60(b)(5)). While the considerations identified in *Rufo* may be relevant or even determinative in some cases, they do not define the universe of situations in which an injunction should be modified or dissolved. See *Alexis Lichine & Cie v. Sacha A. Lichine Estate Selections, Ltd.*, 45 F.3d 582, 586 (1st Cir.1995) ("In our view, Rule 60(b)(5) sets forth the umbrella concept of 'equitable' that both *Swift* and *Rufo* apply to particular, widely disparate fact situations," quoted with approval in *Bellevue Manor*, 165 F.3d at 1256); *Building and Const. Trades Coun-*

cil of Philadelphia and Vicinity, AFL–CIO v. N.L.R.B., 64 F.3d 880, 888 (3d Cir.1995) ("It would be a mistake to view either *Rufo* or *Swift* as encapsulating a universal formula for deciding when [a] point has been reached [where modification or dissolution is appropriate]. Instead, each of those cases represents a response to a particular set of circumstances. A court of equity cannot rely on a simple formula but must evaluate a number of potentially competing considerations to determine whether to modify or vacate an injunction entered by consent or otherwise").

In institutional reform litigation, courts must be particularly attuned to the "broader impact of an sweeping public-litigation-type injunction in determining whether to modify or vacate prior relief." *Bellevue Manor*, 165 F.3d at 1257. A sweeping injunction, which "reach[es] beyond the parties involved ... and impact[s] on the public's right to the sound and efficient operation of its institutions" (*Rufo*, 502 U.S. at 381, 112 S.Ct. 748), remains equitable only so long as it effectively addresses the problem it was designed to remedy. See *King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (1969) (Friendly, J.) (a court's equitable powers to modify injunctions extends to instances where "the decree is not properly adapted to accomplishing its purpose"). Where a problem has been resolved or mooted by changed circumstances, then equity and the public's interest in the "sound and efficient operation of its institutions" demands the injunction's dissolution. The question in this case, therefore, is whether the *Orantes* injunction has outlived its purpose and usefulness—in other words, whether evolving circumstances have resolved the underly-

ing problems, thereby rendering the injunction unnecessary. See *City of Chicago*, 663 F.2d at 1360 ("The standard for modification of injunctions that emerges from *Swift* and *United Shoe* is ... not based solely on hardship to the enjoined party. The standard also incorporates consideration of whether there remains any need to continue the injunction, that is, whether 'the purposes of the litigation as incorporated in the decree' have been achieved"); *United States v. Swift & Co.*, 189 F.Supp. 885, 905 (N.D.Ill.1960) ("[I]t is only change that reaches the underlying reasons for the decree that is relevant. Conditions existing at the time of original entry must be compared with conditions at the time of requested modification, and the significance of the difference measured in the light of these original reasons"), aff'd., 367 U.S. 909, 81 S.Ct. 1918, 6 L.Ed.2d 1249 (1961). To answer that question, the court first considers the purpose of the *Orantes* injunction and the injustice that it was designed to remedy.

## B. The *Orantes* Injunction

Judge Kenyon entered a preliminary injunction in 1982, a permanent injunction in 1988, and a modified permanent injunction in 1991. At the time, class members were coming to the United States from a country that was embroiled in a twelve-year civil war that killed an estimated 75,000 people between 1980 and 1992,[3] and gave rise to rampant human rights abuses and political violence.[4] By 1988, in a country with a population of approximately five million, some 45,000 innocent civilians had been murdered by soldiers, security forces, and death squads. *Orantes II*, 685 F.Supp. at 1492. An additional 4,000 civilians had "disappeared." *Id.* Political

---

**3.** Mot., Exh. F at 59 (U.S. Department of State, Background Note: El Salvador, Feb. 2005).

**4.** *Id.* at 60.

dissidents and prisoners were subjected to arbitrary detention, arrest, intimidation, torture, and execution. *Id.* at 1492–93. Salvadoran civilians reported repeated bombings and ground attacks, forced relocation, and harassment by the military. *Id.* at 1493. Judge Kenyon concluded that, faced with these conditions, many Salvadorans made a decision "born of desperation" to enter the United States. *Orantes I*, 541 F.Supp. at 358. He found, moreover, that class members would suffer "the most serious of deprivations" if they were deported to "a country overrun with civil war, violence, and government-sanctioned terrorist organizations." *Id.* at 1504.

Given the civil war and human rights abuses in El Salvador, Judge Kenyon stated, many Salvadorans who entered the United States had a "well-founded fear of persecution" and "good faith claims to asylum." *Orantes II*, 685 F.Supp. at 1491. Despite this fact, he found, many Salvadorans were misled or coerced into giving up their right to request asylum by INS officers who "engaged in a pattern and practice of summarily removing Salvadorans from the country by obtaining their signatures on ... voluntary departure form[s] through intimidation, threats, and misrepresentation." *Id.* at 1505. Once an individual consented to voluntary departure, he or she was subject to removal from the country without a deportation hearing or an opportunity to request asylum. *Id.* at 1494.

Judge Kenyon found that the INS' practices were the result of agents' misunderstanding of Salvadorans' reasons for coming to the United States, and Salvadorans' reluctance to communicate their traumatic experiences to INS officials. *Id.* at 1496–97. After hearing extensive testimony, Judge Kenyon concluded that many INS agents felt Salvadorans entered the U.S. "solely for economic gain"—an attitude that "reflect[ed] a lack of sensitivity ... [born of] ignorance on the part of INS agents [regarding] the complex motivations and situations of those who ha[d] fled El Salvador." *Id.* at 1496. In addition, he found, Salvadorans who fled persecution by soldiers and guerillas in El Salvador felt uncomfortable confiding in "a uniformed officer of the United States ... because [they were] aware that the United States support[ed] the Salvadoran government, which tolerate[d] and participate[d] in [the] acts of terror." *Id.* at 1497. Those Salvadorans who reached the United States often experienced psychological trauma or guilt because they had abandoned their country and their families; this made them reluctant to communicate their experiences to the INS agents who interviewed them. *Id.* Many also feared that the information they revealed would endanger family and friends who remained in El Salvador. *Id.* Judge Kenyon found that the INS knew of these problems and refused to compensate for them. *Id.*

Instead, he concluded, INS officers routinely told class members that "if they appl[ied] for asylum they [would] remain in detention for a long time" (*id.* at 1494–95); "that Salvadorans [did] not get asylum" (*id.* at 1495); that the "information on the [asylum] application [would] be sent to El Salvador" (*id.;* see also *Orantes I*, 541 F.Supp. at 360); that they would be transferred to remote locations (*Orantes II*, 685 F.Supp. at 1495); and that women would be placed in a cell with men, where they might be sexually molested (*Orantes I*, 541 F.Supp. at 360).

Judge Kenyon found that such threats and misrepresentations were typically combined with deliberate withholding of information about the asylum process. He concluded that the INS routinely distributed legal services lists to Salvadorans that contained inaccurate, incomplete, or non-

working telephone numbers for legal services agencies (*Orantes II*, 685 F.Supp. at 1497); that the agency failed to provide legal services lists to Salvadorans altogether (*id.* at 1498); and that it refused to advise Salvadorans of the availability of political asylum, even when they requested the opportunity to apply for asylum or recounted experiences that suggested eligibility for asylum (*id.*). He also found that Salvadorans were "frequently singled out for transfer to distant facilities," where they were isolated from friends and relatives who could have assisted them. *Id.* at 1500.

Judge Kenyon heard extensive evidence that led him to conclude that INS officials regularly pressured Salvadorans to return to El Salvador (*id.* at 1501); severely limited Salvadorans' visitation opportunities with attorneys and paralegals (*id.*); failed to ensure Salvadorans' privacy during attorney-client interviews (*id.*); refused to provide legal materials, legal forms, law libraries, and writing materials to Salvadorans (*id.* at 1501–02); restricted Salvadorans' access to telephones (*id.* at 1502); and segregated Salvadorans in solitary confinement without providing hearings (*id.*).

Judge Kenyon concluded that the INS' "practice and pattern" of mistreating, pressuring, and intimidating Salvadorans into giving up their asylum claims was "widespread and pervasive" (*id.* at 1505), and was "highly likely to result ... in class members being deprived of their right[ ] to a deportation hearing" (*id.* at 1496). This pattern and practice, he found, warranted the entry of permanent injunctive relief. *Id.* at 1505. The injunction Judge Kenyon entered required that the government give Salvadorans an advisal of rights, which came to be known as the *Orantes* advisal, as well as a list of organizations that provided free legal services. It also prohibit-

ed the INS from transferring unrepresented Salvadorans out of the district where they were arrested for a period of seven days, so that they could more easily retain attorneys. In addition to these measures, which were designed to ensure that Salvadorans received notice of their right to apply for asylum and had the ability to pursue it effectively, the injunction prescribed certain conditions of confinement for Salvadoran detainees, including hearings before they could be placed in solitary confinement, and regular access to legal materials, telephones, and legal professionals.[5]

Judge Kenyon based the advisal remedy on "three alternative and independent legal bases." See *Orantes–Hernandez v. Thornburgh*, 919 F.2d 549, 556 (9th Cir. 1990) (*"Orantes III"*). "One [was] that notice [was] required as a matter of due process." *Id.* (citing *Orantes II*, 685 F.Supp. at 1506–07, Conclusions of Law 24–25). The second "[was] that notice [was] required in order to fully effectuate the intent of the Refugee Act." *Id.* (citing *Orantes II*, 685 F.Supp. at 1506, Conclusions of Law 19–23). The third and final basis for the remedy was that "notice [was] required ... as a remedial measure to counteract the pattern of interference by the INS with the plaintiff class members' ability to exercise their right[ ]" to apply for asylum. *Id.* (citing *Orantes II*, 685 F.Supp. at 1507–08, Conclusions of Law 26–43). Judge Kenyon based the provisions of the injunction governing detention center conditions and the transfer of Salvadoran detainees to remote facilities on Salvdorans' rights to retain counsel at non-government expense and to access the courts. *Orantes II*, 685 F.Supp. at 1510–11.

As respects the first basis for the advisal remedy, Judge Kenyon applied the famil-

**5.** See *Orantes* Injunction.

iar test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and found that Salvadorans had a due process right to notice of their right to apply for asylum. Under *Mathews*, a court must balance plaintiff's private interest and the risk of an erroneous deprivation of that interest due to inadequate government procedures against the Government's interest, including the burden that additional procedures will entail. *Id.* at 335, 96 S.Ct. 893. Judge Kenyon observed that one could not "overstate the dire consequences" that would attend an erroneous deprivation of Salvadorans' right to apply for asylum. *Orantes II*, 685 F.Supp. at 1504. Citing conditions in El Salvador, he observed that immigrants of other nationalities might not have the same due process right to notification of their right to apply for asylum, as "[t]he calculation of the *Mathews* balancing test could be quite different for other nationalities." *Id.* at 1508.

Judge Kenyon's second basis for the advisal remedy—that notification was necessary to effectuate the intent of the Refugee Act—was similarly influenced by the horrific conditions Salvadorans faced if erroneously returned to a country in the midst of a civil war. After noting that the Refugee Act mandates "[n]otification of the right to apply for asylum and ... relief from deportation," Judge Kenyon distinguished the Eleventh Circuit's *en banc* decision in *Jean v. Nelson*, 727 F.2d 957 (11th Cir.1984). The *Jean* court had held that Congress did not include a notice requirement in the Refugee Act, and that none could be implied because Congress provides many rights without mandating that the government publicize their avail-

ability. Judge Kenyon observed that "few of th[e] other [rights to which the *Jean* court made reference had] arise[n] in circumstances so perilous as those in which class members [found] themselves," and continued: "The situations of those who have fled El Salvador ... are not typical of the various opportunities which Congress has provided to others within the United States." *Orantes II*, 685 F.Supp. at 1506.

Judge Kenyon's third basis for the advisal remedy was his finding that the INS engaged in a "practice and pattern of summarily removing Salvadorans from this country by obtaining their signatures on voluntary departure forms through intimidation, threats, and misrepresentations" about the availability of asylum. *Id.* at 1505. This "persistent pattern of misconduct" justified mandating that the government provide an advisal "to counteract the pattern of interference by the INS with the plaintiff class members' ability to exercise their rights." *Orantes III*, 919 F.2d at 556, 558. The Ninth Circuit noted that such a remedy would have been inappropriate had there been a showing of "relatively few instances of violations by [defendants], without any showing of a deliberate policy on behalf of the named defendants." *Id.* at 557–58. It concluded, however, that Judge Kenyon did not clearly err when he found "a pattern of interference with the class members' right to apply for asylum." *Id.* at 561.[6]

The Ninth Circuit likewise affirmed the provisions of the injunction precluding transfer of Salvadorans to remote detention facilities for seven days, and requiring detention centers to facilitate Salvadorans'

---

**6.** As a result, the Ninth Circuit did not need to reach the constitutional and statutory grounds on which Judge Kenyon had relied in ordering that the government provide the *Orantes* advisal to Salvadorans. See *Orantes III*, 919 F.2d at 557. Rather, it affirmed Judge Ken-

yon's entry of the injunction solely on the basis that it was an appropriate remedy to counteract the INS' pattern and practice of intimidating and threatening Salvadorans, and misrepresenting the availability of asylum to them.

access to attorneys and/or legal materials, on the grounds that Judge Kenyon did not err in finding "a pattern of [INS] practices which severely impeded class members from communicating with counsel." *Id.* at 566–67.

## C. Relevant Circumstances Today

At the hearing, the parties addressed whether, and to what extent, the court should consider changed conditions in El Salvador and changed conditions in the United States in determining whether to dissolve Judge Kenyon's injunction. Plaintiffs contend that the Ninth Circuit's opinion in *Orantes III* renders it unnecessary—indeed inappropriate—to consider changed conditions in El Salvador. The government counters that changed conditions in El Salvador constitute an independent ground that alone justifies dissolution of the *Orantes* injunction. The court addresses these contentions below, as well as the relevance of changed conditions in the United States.

In affirming Judge Kenyon's decision, the *Orantes III* court noted, as a threshold matter, that it was undisputed that "all aliens possess ... a right [to apply for asylum] under the [Refugee] Act." *Id.* at 553. Because Judge Kenyon's injunction was designed to ensure that plaintiff class members could exercise this right, the court stated, the dispute concerned "not rights but remedies." *Id.* at 556. Although the Ninth Circuit identified the three bases on which Judge Kenyon relied in mandating the advisal remedy (see *id.*), it concluded, as noted, there was no need to reach the constitutional or statutory grounds he had cited. Rather, the court held that imposition of an advisal remedy was justified by Judge Kenyon's finding that the INS had engaged in a pattern of interfering with class members' ability to

exercise their right to apply for asylum. *Id.* at 556. Specifically, the court held (1) that there was ample evidence class members had "experienced direct interference with their ability to apply for asylum" (*id.* at 563); and (2) that the government had conceded that a pattern of coercion and interference with class members' right to apply for asylum would violate the Refugee Act (*id.* at 557). The *Orantes III* court acknowledged that Judge Kenyon had "made extensive findings of fact regarding the political conditions in El Salvador" as the basis for concluding that class members had a due process right to notice that they could apply for asylum. *Id.* at 557 n. 13. Because it concluded that it need not reach the constitutional justification for the injunction, however, the Ninth Circuit declined to address the government's argument that conditions in El Salvador were irrelevant in evaluating class members' right to receive notice. *Id.*

Plaintiffs argue that *Orantes III* establishes "that the injunction stands based on the pattern of conduct of the Immigration Service towards Salvadorans." [7] By affirming the injunction without reaching the government's objection to Judge Kenyon's consideration of conditions in El Salvador, plaintiffs assert that the Ninth Circuit held—"as a matter of res judicata and finality"—that country conditions were irrelevant.[8] Consequently, they maintain, in considering the government's motion to dissolve the injunction, the court must limit its inquiry solely to the immigration practices and detention conditions on which the *Orantes III* court relied in affirming Judge Kenyon's injunction. Neither the "law of the case" doctrine nor res judicata mandates use of this approach.

---

7. Reporter's Transcript ("RT"), Dec. 20, 2006, at 7:5–9.

8. *Id.*

To promote finality, the "law of the case" doctrine holds that "the decision of an appellate court on a legal issue must be followed in all subsequent proceedings in the same case." *United States v. Cote*, 51 F.3d 178, 181 (9th Cir.1995) (quoting *Herrington v. County of Sonoma*, 12 F.3d 901, 904 (9th Cir.1993)). The doctrine acts as a bar only to issues that were "actually considered and decided by the first court," however. *Id.* (citing *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 834–35 (9th Cir.1982)). Thus, while the doctrine "applies to a court's explicit decisions as well as those issues decided by necessary implication, ... it clearly does not extend to issues an appellate court did not address." *Id.* (quoting *Eichman v. Fotomat Corp.*, 880 F.2d 149, 157 (9th Cir.1989); *Luckey v. Miller*, 929 F.2d 618, 621 (11th Cir.1991)). The doctrine is closely related to res judicata, or claim preclusion, which "ensures the finality of decisions" by "bar[ring] further claims by parties or their privies based on" a cause of action previously decided by a final judgment on the merits. *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979).

The two concepts differ primarily in that res judicata is typically applied to bar relitigation of a claim previously litigated in *another* suit, while the "law of the case" doctrine ensures the finality of legal issues decided in an earlier proceeding in the *same* suit. See *Arizona v. California*, 460 U.S. 605, 619, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (explaining that res judicata and law of the case are related concepts, but noting that "the technical rules of preclusion are not strictly applicable" to law of the case); *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999) ("The doctrine of law of the case is similar to the issue preclusion prong of *res judicata* in that it limits relitigation of an issue once it has been decided. However, law of the case is concerned with the extent to which law applied in a decision at one stage of litigation becomes the governing principle in later stages of the same litigation. *Res judicata* does not speak to direct attacks in the same case, but rather has application in subsequent actions"). Because plaintiffs' argument is directed to an issue that they contend was implicitly decided and rejected by the Ninth Circuit in an earlier proceeding in this action, the court analyzes the contention under the "law of the case" doctrine.

In *Orantes III*, the Ninth Circuit noted that Judge Kenyon had evaluated evidence of country conditions "in determining that the class members had a due process right to notice of the right to apply for asylum." *Orantes III*, 919 F.2d at 557 n. 13. Because it affirmed the injunction on an alternate ground and declined to reach the constitutional due process basis for Judge Kenyon's decision, the court concluded that it "need not address the government's argument that conditions in El Salvador are irrelevant." *Id.* This express refusal to address the government's argument belies plaintiffs' assertion that the appellate court necessarily, if implicitly, decided that country conditions evidence was irrelevant. "An appellate court is not presumed to have decided issues ... that were not addressed in its opinion," (*Rivera v. National R.R. Passenger Corp.*, No. C 99–04003 SI, 2004 WL 603587, *5 (N.D.Cal. Mar.22, 2004)), much less issues it explicitly declined to decide. See also *id.* ("Essentially, plaintiff argues that the Ninth Circuit implicitly decided in his favor defendants' assertions regarding RLA preemption and privilege simply because the arguments were made somewhere in the record before the appellate court. This is not what the law of the case requires. ... The law of the case doctrine does not extend to issues the appellate court did not address. Accordingly, this Court is free to address defendants' arguments concerning RLA preemption and privilege"). Because the

government's argument regarding the relevance of conditions in El Salvador was not addressed in *Orantes III*, either explicitly or implicitly, the court cannot accept plaintiffs' argument that finality or the "law of the case" doctrine limits the court's ability to consider the issue now.

Plaintiffs next argue that even if the court concludes that conditions in El Salvador are so changed that the injunction is no longer warranted to redress the constitutional due process violation Judge Kenyon found, it cannot grant the government's dissolution motion unless it also finds that the injunction is no longer required to address the pattern and practice of interference with asylum rights on which the Ninth Circuit relied.[9] This latter inquiry, plaintiffs assert, does not implicate changed country conditions in any way. The court agrees that the Ninth Circuit's decision is relevant in assessing the weight to be given the various grounds on which Judge Kenyon relied in entering the injunction; for this reason, the court has considered carefully evidence regarding ICE's practices at border patrol stations, at ports-of-entry, and at detention centers. The fact that the Ninth Circuit elected to address only one of the three grounds on which the injunction was entered does not mean, however, that the court may give *no* weight to changed conditions in El Salvador.

Plaintiffs' argument to the contrary confuses the legal basis on which the Ninth Circuit affirmed the *Orantes* injunction with the equitable basis on which the injunction was entered in the first place. Unlike the district court, the Ninth Circuit was not tasked with the responsibility of determining whether the balance of equities favored issuance of an injunction. As framed by the *Orantes III* court, the "key issue" on appeal was a narrow one: "whether the record support[ed] the dis-

trict court's decision to make ... permanent [the preliminary *Orantes* injunction]," which the government had not appealed. *Orantes III*, 919 F.2d at 561.

By contrast, the court today sits in Judge Kenyon's place, and does so as a court of equity. Well-established equitable rules demand that the court take into account all of the circumstances before it in determining whether "it is ... equitable that the judgment ... [continue to] have prospective application." FED.R.CIV.P. 60(b)(5); see also *Bellevue*, 165 F.3d at 1256 (under Rule 60(b)(5), a court should "take all the circumstances into account in determining whether to modify or vacate a prior injunction or consent decree"). In doing so, it must look to the evidence that Judge Kenyon had before him, and determine whether the circumstances reflected in that evidence have changed to a sufficient degree that equity no longer favors continuance of the injunction. It is clear from a review of *Orantes II* that Judge Kenyon's entry of an injunction was heavily influenced by the conditions that existed in El Salvador at the time. See, e.g., *Orantes II*, 685 F.Supp. at 1504 (observing that "[r]emoval to a country overrun with civil war, violence, and government-sanctioned terrorist organizations" would potentially "lead to the most serious of deprivations").

On appeal, the government conceded that "if the evidence in th[e] case support[ed] the district court's findings of a pattern of coercion and interference with the plaintiff class members' right to apply for asylum, then ... remedial action would be justified." *Orantes III*, 919 F.2d at 557. Given this concession, the Ninth Circuit reviewed Judge Kenyon's findings regarding a pattern or practice of interference with the right to apply for asylum under the clearly erroneous standard, and

9. RT, Dec. 20, 2006, at 36:5–9.

did not address the totality of evidence Judge Kenyon considered in determining that injunctive relief was warranted.

■ The Ninth Circuit's holding that the injunction was legally justified whether or not class members' due process rights had been violated does not mean that the injunction was equitably justified absent such a finding. See *Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) ("In shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow.... Moreover, in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable.... In equity as nowhere else courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding those interests may have constitutional roots"). Consequently, the court concludes that it is appropriate to consider present conditions in El Salvador, and contrast them with the conditions that obtained at the time Judge Kenyon entered a permanent injunction, in evaluating whether all of the circumstances that presently obtain warrants dissolution of the injunction.

For similar reasons, the court declines the government's invitation to limit the dissolution inquiry to changed conditions in El Salvador. Judge Kenyon balanced all of the evidence before him—conditions in El Salvador, INS practices in the United States, and detention center conditions—in determining that an injunction was an appropriate equitable remedy. In the absence of an appellate decision stating that it was inappropriate for him to consider one or more of these factors, the court concludes that it must consider all of the circumstances Judge Kenyon took into account in evaluating whether to dissolve the injunction. See *Bellevue*, 165 F.3d at 1256 (under Rule 60(b)(5), a court should "take all the circumstances into account in determining whether to modify or vacate a prior injunction or consent decree").

## D. Changed Country Conditions In El Salvador

In 1992, the United Nations brokered Peace Accords that ended the twelve-year civil war in El Salvador and laid out an ambitious agenda to guarantee basic human rights.[10] In keeping with the Peace Accords, El Salvador amended its constitution to prohibit the military from playing any internal security role in the country except in extraordinary circumstances.[11] The Treasury Police, National Guard, and National Police—the primary human rights violators during the civil war (*Orantes II*, 685 F.Supp. at 1492)—were abolished, and military intelligence functions were transferred to civilian control.[12] In 1994, the guerilla forces demobilized and became a political party that competed in what were recognized as generally free and fair elections that year.[13]

The Peace Accords also established a Truth Commission to investigate "serious acts of violence that ha[d] occurred since 1980." See Reed Brody, *The United Nations and Human Rights in El Salvador's "Negotiated Revolution,"* 8 HARV. HUM. RTS. J. 153, 158 (1995). In 1993, the Truth Commission issued a report publicly identifying the individuals responsible for the

---

**10.** Declaration of Geoffrey Thale ("Thale Decl."), ¶ 11.

**11.** Mot., Exh. F at 60 (U.S. Department of State, Background Note: El Salvador, Feb. 2005).

**12.** *Id.*

**13.** Thale Decl., ¶ 12.

most egregious violations. *Id.* at 165. Although the Salvadoran government subsequently granted amnesty for all political crimes committed during the war,[14] it accepted the resignations of all of the military officers identified by the Commission, effectively purging the individuals most responsible for the abuses from the country's leadership structure. See Mark Vasallo, *Truth and Reconciliation Commissions: General Considerations and a Critical Comparison of the Commissions of Chile and El Salvador*, 33 U. MIAMI INTER-AM. L. REV. 153, 177 (2002).

El Salvador's economy, which is primarily agricultural, has grown "at a steady and moderate pace" since 1992. The Department of State attributes much of the improvement to "free market policy initiatives carried out by the . . . government[ ], including the privatization of the banking system, telecommunications, public pensions, electrical distribution and some electrical generation, reduction of import duties, elimination of price controls, and enhanc[ement of] the investment climate through measures such as improved enforcement of intellectual property rights."[15] A land-transfer program that ended in 1997 deeded land to more than 35,000 individuals; many also received agricultural credits.[16] In 1995, the United Nations Human Rights Commission re-

moved El Salvador from its list of countries subject to permanent monitoring.[17] That same year, the UN Secretary General declared the peace process in El Salvador "irreversible." [18]

El Salvador today is recognized as "a constitutional, multiparty democracy with a unicameral legislature, an independent judiciary, and an executive branch headed by a president." The president is elected by universal suffrage in "generally free and fair" presidential elections are is not marred by violence or "notable irregularities." [19] The 2004 and 2005 Department of State country reports for El Salvador document no politically motivated killings or disappearances. There are no political prisoners, and no reports of kidnapping by governmental actors. Salvadoran law prohibits torture and other cruel and inhumane treatment or punishment, although there have been some reports of excessive force, misconduct, and detainee mistreatment by police officers. The Department of State country reports conclude that the Salvadoran government "generally respect[s] the human rights of its citizens." In addition, Salvadoran law safeguards freedom of speech and of the press, "and the government generally respect[s] these rights in practice." [20] According to the State Department's most recent Profile of Asylum Claims and Country Conditions for

14. Mot., Exh. F at 60 (U.S. Department of State, Background Note: El Salvador, Feb. 2005).

15. *Id.* at 61.

16. *Id.*

17. Mot., Exh. X at 246 (U.S. Department of State, *El Salvador—Profile of Asylum Claims and Country Conditions*, Apr. 2003).

18. *Id.*

19. Mot., Exh. E (U.S. Department of State, Country Reports on Human Rights Practices,

El Salvador, 2004); Mot., Exh. F (U.S. Department of State, Background Note: El Salvador, Feb. 2005).

20. Mot., Exh. E (U.S. Department of State, Country Reports on Human Rights Practices, El Salvador, 2004); Pls.' Exh. 46 (U.S. Department of State, Country Reports on Human Rights Practices, El Salvador, 2005). See generally Thomas C. Wright, *Human Rights in Latin America: History and Projections for the Twenty–First Century*, 30 CAL. W. INT'L L.J. 203, 318 (2000) (explaining that "respect for human rights in Latin America— understood as individual liberties—has vastly improved").

El Salvador, "[s]ince the 1992 peace accords ... recent mistreatment with political motivation would seem unlikely in most cases."[21]

Neither party seriously disputes that conditions in El Salvador are drastically different than they were in the 1980s when Judge Kenyon entered the *Orantes* injunction. The civil war is over, as is the widespread brutality that led the court to conclude in 1982 and 1988 that "a substantial number" of Salvadorans who fled the country had good faith asylum claims and well-founded fears of persecution. *Orantes II*, 685 F.Supp. at 1491. Thus, the conditions in El Salvador that led Judge Kenyon to conclude that the consequences attending deprivation of Salvadorans' right to apply for asylum were "most serious" disappeared with the end of the Salvadoran civil war and concomitant improvements in political, economic, and social conditions in the country.

Tacitly acknowledging this sea change in factual circumstances, plaintiffs do not argue that Salvadorans today face unique risks from an erroneous deprivation of their right to apply for asylum. Instead, they argue that Judge Kenyon "never purported to decide that Salvadorans were a group warranting special treatment not afforded to other asylum seekers."[22] This argument is directly contradicted, however, by Judge Kenyon's statement that "[t]he calculation of the *Mathews* balancing test could be quite different for other nationalities," and that "[i]njunctive relief requiring the administration of an advisal of rights to detained Salvadorans does not mandate the provision of the same advisal to any other nationalities." *Id.* at 1508.

At oral argument, plaintiffs conceded that not all nationalities are entitled to a court-mandated advisal of their right to apply for asylum.[23] They argued, however, that the *Orantes* injunction remains necessary to protect the rights of Salvadorans because even today, El Salvador is "a country in significant chaos." For this reason, plaintiffs contended, some Salvadorans continue to have good faith claims to asylum in the United States.[24] Plaintiffs rely on evidence of domestic violence and gender-based persecution in El Salvador,[25] as well as violence against persons who are homosexual, transgender, transvestite, or HIV-positive.[26] In addition, they have proffered evidence of widespread gang-related problems in the country.[27] El Salvador's two major gangs, "Mara Salvatrucha" and "Barrio 18," now claim to have approximately 10,000 members.[28] It is

**21.** Mot., Exh. X at 243 (U.S. Department of State, Bureau of Democracy, Human Rights and Labor, *El Salvador—Profile of Asylum Claims and Country Conditions*, Apr. 2003).

**22.** Opp. at 40:20–22.

**23.** RT, Dec. 20, 2006, at 12:14–13:2.

**24.** *Id.* at 12:11–13; Opp. at 41:5–14.

**25.** Pls.' Exh. 48 (U.N. Economic and Security Council, *Integration of the Human Rights of Women and a Gender Perspective: Violence Against Women* (Feb.2004)) (reporting that "[i]mpunity for crimes, the socio-economic disparities and the *machista* culture foster a generalized state of violence, subjecting women to a continuum of multiple violent acts, including murder, rape, domestic violence,

sexual harassment and commercial sexual exploitation").

**26.** Pls.' Exh. 63 (UNHCR, *El Salvador: Treatment of Homosexuals by the Authorities and the General Public, 2002–2004* (Mar.2004)); Pls.' Exh. 64 (UNHCR, *El Salvador: Follow-up to SLV39432.FE of 26 June 2002 on the Treatment of Homosexuals by the Public and the Authorities* (Sept.2002)).

**27.** Pls.' Exh. 49 (Sam Logan et al., *Deportation Feeds a Cycle of Violence in Central America,* (Mar.2006)).

**28.** Thales Decl., ¶ 23. The State Department does not consider gang violence to be a major security concern in El Salvador. (Mot., Exh. X at 235 (U.S. Department of State, Bureau of

common for gangs to extort "protection money" from local businesses—a practice the police have failed to address in any significant way.[29] Additionally, judges, police officers, and witnesses in criminal cases against gang members are often threatened.[30]

In response to the sharp rise in gang violence, the Salvadoran government has implemented harsh anti-gang measures; these have resulted in the unlawful arrest and detention of young people who are perceived to be gang members. Under the country's new "Mano Dura" ("Iron Fist") and "Super Mano Dura" ("Super Iron Fist") laws, for example, police can arrest youth whose dress or tattoos resemble those of gang members.[31] Sus-

pected gang members are treated severely by the judicial system and are the targets of anti-gang vigilante groups that commit extrajudicial killings. The killers are rarely prosecuted although they are informally sanctioned on occasion.[32] In short, the government's measures have led to prosecution of and reprisals against non-gang members, and have aggravated rather than improved gang violence in El Salvador.[33]

All of these conditions have contributed to an atmosphere of social insecurity. Between January and December 2005, criminal violence increased by 34 percent; murders of women and girls increased sharply, as did the incidence of domestic violence.[34] Many of these acts go unpunished by the police, who are not equipped to deal with the problems.[35] In addition, widespread

Democracy, Human Rights and Labor, *El Salvador—Profile of Asylum Claims and Country Conditions*, Apr. 2003)) ("Violent crimes (*including crimes perpetrated by organized criminal gangs, sometimes called maras* ) is not the major security concern in El Salvador").

**29.** Thales Decl., ¶ 29.

**30.** *Id.,* ¶ 28.

**31.** *Id.,* ¶ 22; Pls.' Exh. 50 (Amnesty International, *Americas: Regional Overview 2003* ) ("An anti-gang law was adopted in El Salvador with apparent disregard for the requirements of national law and international standards").

**32.** Thales Decl., ¶ 29.

**33.** *Id.,* ¶ 24 ("Since the implementation of the *Mano Dura* laws, El Salvador has seen increasing organization of the gangs, increasing murder rates, and a consolidation of the prison system as a breeding ground for gangs. The State and the media continue to blame the gangs as a scapegoat for all of the violence in the Salvadoran society, and the police continue to implement laws that have been proven to strengthen the gangs rather than intervene on the increasing violence").

**34.** Pls.' Exh. 51 (Amnesty International, *El Salvador,* covering events from January to

December 2005) (citing statistics by the National Civil Police). According to the Amnesty International report, there were 3,761 murders between January and December 2005, including 323 murders of women and girls between January and November 2005. In addition, the National Civil Police received nearly 12,000 calls reporting incidents of domestic violence; 24 women were killed by partners or family members. The UN Special Rapporteur recommended, in a report published in February 2005, that "the government prevent, investigate and punish acts of violence against women." By the end of 2005, however, authorities had taken no steps to comply with the recommendation, or made any progress in investigating the cases of women who had been killed and/or raped in prior years. (*Id.*). In April 1999, for example, nine-year-old Katya Miranda was raped and killed in her family home. Despite the Attorney General's public commitment to re-open the investigation, "[n]o progress was known to have been made in bringing to justice those responsible." (Pls.' Exh. 52 (Amnesty International, *El Salvador,* covering events from January to December 2003)).

**35.** Pls.' Exh. 53 (Letter from Amnesty International to H E Elias Antonio Saca, President of El Salvador, Oct. 13, 2005); Pls.' Exh. 54 (UNHCR, *El Salvador: Domestic Violence, Including Resources, Remedies, and Services for Victims* (Apr.2004)).

corruption in the police forces, as well as ties between police officers and organized crime, ensure that many crimes are not investigated; as a result, criminals can operate with impunity.[36] Plaintiffs assert that the existence of these social conditions in El Salvador provide a basis for asylum claims [37] by some Salvadorans.[38]

**36.** Pls.' Exh. 66 (Hector Tobar, *Human Rights Defender Hardly Looks the Part*, L.A. TIMES, Apr. 10, 2006).

**37.** Such asylum claims typically assert that the applicant has a "well-founded fear of future persecution 'on account of ... membership in a particular social group.'" INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A). In the Ninth Circuit, a "'particular social group' is one united by a voluntary association, including a former association, or by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it." *Hernandez–Montiel v. I.N.S.*, 225 F.3d 1084, 1093 (9th Cir.2000). Applying this standard, courts considering asylum claims have held that sexual orientation can be the basis for membership in a "particular social group." *Id.* at 1094 (holding that the appropriate "particular social group" in that case was composed of "gay men with female sexual identities in Mexico"). Similarly, courts have recognized "particular social groups" who share a likelihood of gender-based harm. See, e.g., *Gao v. Gonzales*, 440 F.3d 62, 70 (2d Cir.2006) (recognizing a "particular social group" of "women who have been sold into marriage ... and who live in a part of China where forced marriages are considered valid and enforceable"); *Mohammed v. Gonzales*, 400 F.3d 785, 796 (9th Cir.2005) ("Although we have not previously expressly recognized females as a social group, the recognition that girls or women of a particular clan or nationality ... may constitute a social group is simply a logical application of our law"). In a brief submitted in 2004, the DHS took the position that "married women in Guatemala who are unable to leave the relationship" were a "particular social group" for asylum purposes. (Pls.' Exh. 45 (DHS Position on Respondent's Eligibility for Relief, *Matter of R–A–*, File No. A 73 753922) (Feb. 19, 2004) at 25–31). In certain cases, immigration judges and the BIA have also recognized that retaliation against persons opposing gang activities, including persons who refuse to join or attempt to leave a gang, may constitute persecution based on political opinion or membership in a particular social group. (Pls.' Exhs. 41–44 (IJ cases); Pls.' Exh. 59 (N.C. Aizenman, *More Immigrants Seeking Asylum Cite Gang Violence*, WASH. POST, Nov. 15, 2006) (describing lawyers and immigration advocates' efforts to obtain asylum for individuals targeted by gang violence in Central America, but noting that "[i]mmigration judges have frequently ruled against applicants who were victims of gangs because of bad luck or who have faced conscription by a gang simply because they were young and male")). These precedents do not establish that the social ills in Salvador today necessarily support asylum claims. They suggest, however, that similar claims have in the past been recognized by courts.

**38.** Plaintiffs submit the following data, which shows the number of asylum applications by Salvadorans in 1987, 1988, 2004, and 2005:

| Asylum Applications By Salvadorans | | | |
|---|---|---|---|
| | Received | Granted | Denied |
| 1987 % | 2,684 | 39 | 776 |
| 1988 % | 27,048 | 149 | 3,822 |
| 2004 + | 2,758 | 160 | 1,022 |
| 2005 * | 3,630 | 64 | 696 |

% Asylum cases filed with the INS district director.
* Applications received, granted, and denied by the immigration courts.
+ Applications received, granted, and denied by the USCIS Asylum Offices and the immigration courts. See Pls.' Exh. 35 (EOIR FY 2005 Statistical Year Book); Pls.' Exh. 37 (INS 1987 Statistical Yearbook); Pls.' Exh. 38 (INS 1988 Statistical Year Book); Pls.' Exh. 39 (DHS 2004 Yearbook of Immigration Statistics); Pls.' Exh. 40 (EOIR FY 2004 Asylum Statistics). The number of granted and denied applications does not equal the number of applications received. Some applications are not adjudicated within a year of submission, however, and many are abandoned, withdrawn, or classified as "other."

The court finds this data only minimally probative. First, it is unclear why only 39 and 160 individuals were granted asylum in 1987 and 1988. The Salvadoran civil war was ongoing, as were the human rights

This evidence, while indicative of a country experiencing social difficulties, is not relevant to the court's inquiry regarding changed circumstances in El Salvador. Plaintiffs would have the court conduct the *Mathews* balancing test anew, and conclude that the risks faced by Salvadorans who may be erroneously removed from the United States today outweigh the burden on the government involved in giving the *Orantes* injunction. As the court tasked with determining whether changed circumstances have rendered the *Orantes* injunction unnecessary, however, the court must consider the conditions that led Judge Kenyon to enter the injunction in the first instance, not a new set of conditions that might warrant the entry of an injunction were they presented to a court today.

*Dowell* is instructive in this regard. In 1972, the district court ordered the Board of Education of Oklahoma City to adopt a school busing plan in order to remedy *de jure* segregation in its public schools. *Dowell*, 498 U.S. at 240–41, 111 S.Ct. 630. Five years later, the court granted the Board's petition to terminate the case, finding that the school board had been "sensitized to the constitutional implications of its conduct" and that it was "entitled to pursue in good faith its legitimate policies without the continuing constitutional supervision of" the court. *Id.* at 241, 111 S.Ct. 630. In subsequent years, the growth of the suburbs and "white flight" required that black children be bused further and further away from their homes to maintain an integrated school district. *Id.* at 242, 111 S.Ct. 630. As a result, the school board adopted a neighborhood assignment plan, under which 11 of 64 elementary schools in the district would be 90 percent black; 22 would be 90 percent white; and 31 would be racially mixed. *Id.* at 242, 111 S.Ct. 630.

Plaintiffs petitioned to reopen the case. When the district court refused, they appealed. The Tenth Circuit reversed, holding that the desegregation decree had never been terminated. *Id.* at 243, 111 S.Ct. 630. On remand, the district court vacated the decree, finding that the new neighborhood assignment plan was not designed with discriminatory intent and that any resulting racial segregation was "the result of private decisionmaking and economics," which was too attenuated to be a vestige of the earlier segregation that justified entry of the busing decree in 1972. *Id.* The Tenth Circuit reversed again, concluding that the "number of schools [that] would [be] return[ed] to being primarily one-race schools ... [showed that] circumstances in Oklahoma City had not changed enough to justify modification of the decree." *Id.* at 244, 111 S.Ct. 630. The Supreme Court disagreed, and remanded to the district court to determine whether the Board had made good faith efforts to comply with the injunction, and "whether the vestiges of

abuses that led Judge Kenyon to enter the *Orantes* injunction. As a result, it is difficult to conclude that the relatively low number of successful asylum applications in these years shows that asylum claims filed by Salvadorans during this period lacked merit. (Indeed, this would contradict the very basis upon which plaintiffs sought to have Judge Kenyon issue an injunction.) Rather, the low rate of success may reflect poor advocacy, biased asylum determinations, pressure on Salvadorans to withdraw their applications, or any number of other factors. See *Orantes II*, 685 F.Supp. at 1503 ("INS discriminates against Salvadoran asylum applicants by imposing a higher burden of proof, and the low approval rate of Salvadoran asylum claims is the direct result of this discrimination"). Consequently, it is not possible to interpret the data in the manner plaintiffs suggest—i.e., to conclude that because the percentage of applicants granted asylum in 2004 and 2005 is greater than the percentage of successful applicants in 1987 and 1988, when the injunction was entered, country conditions are as bad, if not worse, than they were twenty years ago. Additionally, it appears that the data for earlier years may not be comparable with the more recent data. The data for 1987 and 1988 reflect applications to the INS district director, while the data for 2004 and 2005 reflect cases heard in immigration courts (2005) or applications heard by immigration courts or by asylum officers (2004). In short, the statistics plaintiffs provide are inconclusive at best.

past discrimination had been eliminated to the extent practicable." *Id.* That the old school board once acted with discriminatory intent did not justify "judicial tutelage for the indefinite future," the Court stated, particularly when the new school board had not acted with discriminatory animus. *Id.* at 249, 111 S.Ct. 630. The Court noted that, if the district court determined that it was appropriate to dissolve the injunction, it could then consider, as a separate question, whether the neighborhood assignment plan comported with due process. *Id.* at 249–50, 111 S.Ct. 630.

The *Dowell* Court's reasoning is clear: because the desegregation decree was plainly intended to remedy intentional discrimination, the elimination of such discrimination rendered it inequitable to maintain the injunction in force. The fact that the board's neighborhood assignment plan might constitute a new Fourteenth Amendment violation, moreover, did not justify continuing the injunction once the problem it was designed to remedy had been eradicated. Like plaintiffs in *Dowell*, plaintiffs here ask the court to adjudicate a new due process claim—this one based on the risks Salvadorans face if erroneously removed to a country where they face gender-, sexual orientation-, youth-, or gang-based persecution. As *Dowell* makes clear, this exceeds the permissible scope of the court's inquiry in deciding the government's motion to dissolve the 1988 injunction.

The dramatic nature of the changed conditions in El Salvador convinces the court that, were he reviewing the matter today, Judge Kenyon would not find that the *Orantes* advisal is necessary "as a matter of due process." *Orantes III*, 919 F.2d at 556. As the Supreme Court has noted, due process "is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Mathews*, 424 U.S. at 334, 96 S.Ct. 893 (quoting *Cafeteria*

*Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). It follows that the due process right is not a fixed one, but one that must be tethered to the "time, place, and circumstances" that gave rise to it. Were Judge Kenyon's conclusion that an injunction was necessary to protect the due process rights of Salvadorans the only basis on which he granted relief, the court would find that changed circumstances had extinguished the right that necessitated the remedy, and thus that the injunction should be vacated.

Judge Kenyon, however, entered the injunction for another reason as well—to remedy the INS' "persistent pattern of misconduct violative of plaintiffs' rights" to apply for asylum. *Orantes III*, 919 F.2d at 558. Weighing the equities between the parties, Judge Kenyon considered not only the grievous risks faced by Salvadorans erroneously returned to a country in the midst of a civil war, but also the INS' deliberate pattern and policy of withholding information, misrepresenting facts, and coercing Salvadorans to waive their right to apply for asylum. Consequently, the court must examine the evidence the parties have proffered regarding changed detainee processing practices and detention center conditions before determining whether the injunction can be dissolved.

### E. Government Interference With Class Members' Right To Apply For Asylum

#### 1. Compliance With The *Orantes* Injunction

Plaintiffs argue that, irrespective of any good faith effort by the government to reform its practices, the motion for dissolution must be denied because it has not complied with the injunction's requirements. Because plaintiffs assert that compliance is a "threshold" requirement for dissolution, the court reviews the case law

regarding compliance and its role in the dissolution inquiry before turning to the evidence.

Although good-faith compliance is often a factor considered by courts in evaluating whether to dissolve an injunction, it is neither a threshold inquiry (as plaintiffs contend) nor a factor that must be taken into account in every case. "[T]he power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." *Carey*, 706 F.2d at 967. Under the flexible standard established by Rule 60(b)(5) and *Rufo*, courts must tailor their inquiry to the circumstances of the case before them. See *Building & Const. Trades Council*, 64 F.3d at 888 ("Different considerations may have greater or lesser prominence in difference cases, not because the cases are characterized one way rather than another but because equity demands a flexible response to the unique conditions of each case"). Like others factors, therefore, compliance can be determinative in one case, and irrelevant in another.

In many cases, an enjoined party's good-faith compliance with a decree figures prominently in the court's dissolution inquiry, because it is a proxy for determining whether the underlying problem has been remedied. See *Dowell*, 498 U.S. at 249, 111 S.Ct. 630 ("A district court need not accept at face value the profession of a school board which has intentionally discriminated that it will cease to do so in the future. But in deciding whether to modify or dissolve a desegregation decree, a school board's compliance with previous court orders is obviously relevant"); *NLRB v. Harris Teeter Supermarkets*, 215 F.3d 32, 36–37 (D.C.Cir.2000) (indications that defendants had continued their unfair labor practices, even after entry of a consent decree, counseled against dissolution, since "the reduction in violation frequency might be a reflection of the effectiveness of

the prospective fine schedule contained in the consent order rather than a result of good intentions on the company's part"); see also *SEC v. Coldicutt*, 258 F.3d 939, 942–43 (9th Cir.2001) (examining defendant's record of compliance with an injunction restraining her from violating §§ 5(a) and 5(b) of the Securities Act to determine whether she might violate the statutes if the injunction were dissolved).

Indeed, compliance over time is often the *only* type of "changed circumstance" that a defendant *can* show in support of a request for dissolution of an injunction. See *SEC v. Thermodynamics, Inc.*, 464 F.2d 457, 461 (10th Cir.1972) ("[I]n instances where the defendant concerned is an individual, and where the alleged violation leading to the injunction was an incident of limited scope or duration, the passage of a substantial period of time with full compliance and with no other violations may be regarded as a significant factor showing a 'change' for these purposes. In reality this is about all an individual can show under these circumstances"); 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE: CIVIL 2d § 2961, at p. 405 (2007) ("Nonetheless, in many cases the critical motivation for the court's lifting of an equitable order does not really seem to be a change in the operative facts of a case as much as a change in the attitude of the enjoined party. A significant period of compliance probably is good evidence of a proper frame of mind and in many cases it is the only showing that a party seeking vacation is able to make to the court").

Here, in contrast, compliance is not the only measure by which the court can determine whether or not the conditions that justified entry of the injunction remains extant today. The government has submitted evidence that it has made overarching, structural changes in the manner in which it processes immigration detainees,

including the adoption of new forms and procedures to ensure that aliens are advised of their right to apply for asylum, the promulgation of detention standards, and the creation of a detention facility review unit dedicated to ensuring that each of the 201 facilities housing aliens for more than 72 hours meets the new standards. In addition, the government has presented compelling evidence that changed country conditions in El Salvador have mooted one of the injunction's goals, i.e. to prevent the return of Salvadorans to a country embroiled in a violent civil war without an opportunity to apply for asylum. In this context, the government's compliance or non-compliance with the terms of the injunction is only one of several relevant factors in assessing whether the injunction should remain in place.

### a. Lack Of Enforcement Proceedings

Plaintiffs concede that no enforcement or contempt proceedings have been brought for 18 years. The most recent enforcement action was filed in 1989 and concluded in 1991, a year before the end of the Salvadoran civil war.[39] In other cases, courts have recognized that a record of compliance—which can be evidenced by the lack of enforcement or contempt actions—is a factor that supports dissolution of an injunction. See *Coldicutt*, 258 F.3d at 943 ("Consistent with our decision in [*SEC v.*] *Worthen*, [98 F.3d 480 (9th Cir. 1996)], and with the views expressed by the Third and D.C. Circuits [in *Building and Constr. Trades Council*, 64 F.3d at 880, and *Harris Teeter Supermarkets*, 215 F.3d at 32], we hold that an extended period of compliance is a factor supporting termination of an injunction, but more is required"). Cf. *Building & Constr. Trades Council*, 64 F.3d at 889 ("The entry of four consent contempt adjudications against BCTC in a period of seven years reflects, at the very least, repeated violations by BCTC.... BCTC's history of compliance for the last six years does not erase its history of noncompliance, as evidenced by the contempt adjudications"); *Harris Teeter Supermarkets*, 215 F.3d at 36 (stating, in an appeal decided in 2000, that "Harris Teeter has failed to establish a 'clean' time frame of compliance given the company's post–1986 violations of the NLRA, its failure to adequately explain the numerous charges filed against it, and its failure to adequately explain the settlements it reached between 1986 and 1995").

The lack of enforcement proceedings is particularly persuasive in the context of an injunction mandating that the government take specific action with respect to as many as 40,000 individuals each year.[40] Given the number of Salvadorans the government detains, there are many opportunities for violation, and thus for the initiation of contempt proceedings. That no enforcement actions have been filed gives rise to a strong inference of compliance.[41]

---

**39.** At the hearing, plaintiffs' counsel asserted that he "included a claim of violation of the *Orantes* injunction in litigation around the San Pedro detention center which was settled in 1998." (RT, Dec. 20, 2006, at 101:13–16). The court has no information before it regarding the nature of this litigation, the alleged violation, the settlement, or whether the settlement addressed violations of the *Orantes* injunction. It therefore has no context that permits assessment of the alleged violation, or counsel's attempt to redress it.

**40.** Declaration of Jonathan Mardo ("Mardo Decl."), ¶ 13; Declaration of Paul E. Morris ("Morris Decl."), ¶ 6. According to the government's statistics, the Border Patrol has apprehended more than 130,000 Salvadorans since 1999. The number of Salvadorans apprehended has risen steadily, increasing from 5,095 in 1999 to 41,406 in 2006. (Mardo Decl., ¶¶ 6–13).

**41.** Plaintiffs contend that the government bears the burden of proof on the motion to dissolve (see, e.g., *Sharp v. Weston*, 233 F.3d

Compare *Building & Constr. Trades Council*, 64 F.3d at 890 (stating that the court could not infer compliance from the fact that no contempt proceedings had been brought against the unions in six years because the unions had not engaged in any picketing for a large portion of those six years; "[t]here is therefore no background upon which any findings could be made that would show that [the unions] ha[ve] in fact learned how to picket without treading on the prohibitions against secondary boycott contained both in the law and the various negotiated consent decrees").

### b. Declarations By Salvadorans Alleging Violations

Plaintiffs have proffered the affidavits of 37 Salvadorans who were recently apprehended and detained by the Border Patrol as evidence that the government has not been complying with the *Orantes* injunction. The government countered with the declarations of the 37 Border Patrol agents who processed each of the affiants. Each agent's declaration is accompanied by a Form I–213, a contemporaneous record of interview, in which the agent describes the conditions under which the affiant was found and detained, lists the forms that were given to the affiant, and summarizes the affiant's description of his or her entry into the United States. The forms also indicate the affiant's responses to questions regarding claims of legal residence or citizenship in the United States.

In some cases, the agent noted that the affiant "stated she did not fear being returned to her home country of El Salvador." [42]

Neither set of declarations is entirely credible. Although 27 of the 37 Salvadoran affiants state that they did not receive advisals or that they received no notice of the right to apply for asylum, the Border Patrol files submitted by the government indicate that all 27 signed and dated advisal forms. While this may suggest, as plaintiffs contend, that the affiants were pressured to sign the forms before they had an adequate opportunity to review them, it also raises questions about the Salvadoran affiants' credibility. These credibility concerns are reinforced by other evidence. First, the government has submitted excerpts from the affiants' A-files; in some instances, the files contain Spanish-language forms signed by affiants who assert that they received only English-language forms. The A-files also include legal service lists signed or initialed by at least three of the seven affiants who state that they never received such a list,[43] raising questions as to whether these individuals habitually sign documents—such as declarations—without reading or understanding what they are signing. Second, many of the affiants' assertions are directly refuted, either by contemporaneous processing records or by a border patrol agent's declaration. The agents assert that they read the forms to the Salvadoran

---

1166, 1170 (9th Cir.2000)), and that its failure to submit affirmative evidence of compliance weighs against dissolution. While such evidence, if obtainable, would assuredly weigh in favor of dissolution, the lack of such evidence does not require that the court infer noncompliance. This is especially true given the nature of the injunctive provision at issue, which necessitates the provision of an advisal to as many as 40,000 individuals each year. The government has shown that no contempt or enforcement proceedings have been filed for 18 years and has submitted evidence re-

butting plaintiffs' proffered proof of noncompliance. This suffices to meet the government's initial burden in the context of the injunction under consideration here.

**42.** See, e.g., Declaration of Renee Luna ("Luna Decl.") at 5.

**43.** See Declaration of Gregory E. Mayer ("Mayer Decl.") at 220; Declaration of Jaime Leija ("Leija Decl.") at 211; Declaration of David B. Sumpter ("Sumpter Decl.") at 125.

affiants, and deny that they rushed or pressured the affiants to sign anything.

There are similar weaknesses in the declarations submitted by the border patrol agents. Most of these declarations are written in nearly identical boilerplate language. While the agents' assertions are corroborated to some extent by contemporaneously-completed Forms I–213, it is clear that the forms use standard, rote phrases to describe the agents' encounters with aliens. While the use of such phrases does not necessarily render a report suspect, in this case it raises questions given the Salvadoran affiants' contrary assertions.

In short, the court has reviewed the parties' declarations, taken note of the evidentiary limitations and credibility concerns relative to both sets of affidavits, and weighed the evidence accordingly.[44] The Salvadoran declarations indicate that some Border Patrol agents appear to treat the *Orantes* advisal as a formality, and that they rush through it with the detainees they are processing. The sample size, however, is too limited to support an inference that there is a widespread pattern of non-compliance, particularly given the credibility limitations already noted. According to the government's fiscal year 2006 statistics, the Border Patrol apprehended 41,406 Salvadorans between ports-of-entry.[45] The 37 Salvadorans who have submitted declarations, therefore, represent about one percent of those detained by the government in 2006.[46] While the

**44.** Both parties have requested an opportunity to depose the declarants offered by their adversary. This appears impossible, as Salvadorans removed following § 240 proceedings are typically deported within 90 days. See *Clark v. Martinez*, 543 U.S. 371, 373, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005) ("If, at the conclusion of removal proceedings, the alien is determined to be inadmissible and ordered removed, the law provides that the Secretary of Homeland Security 'shall remove the alien from the United States within a period of 90 days,'" quoting 8 U.S.C. § 1231(a)(1)(A)). The Salvadorans signed their affidavits on June 28, August 23–24, and October 3–6, 2006. Since all indicate that they were subject to a final order of removal issued following § 240 proceedings, it is highly unlikely that any presently remains in the country. Moreover, this motion has been pending for nearly a year while plaintiffs engaged in substantial discovery. The court sees no reason to permit further depositions at this stage. As for the border patrol agents, the court doubts that any has a specific recollection of the Salvadorans they processed. It presumes, therefore, that their declarations mirror the information contained in the A-files that are already part of the record.

**45.** Mardo Decl., ¶ 13.

**46.** Plaintiffs argue that one may infer a larger pattern of non-compliance from the 37 declarations they submitted, as the affiants were among Salvadorans detained during a two week period at two Border Patrol stations. While this might be a fair inference were the court to credit the declarations fully, the credibility concerns inherent in the declarations counsels against the type of generalization plaintiffs urge.

Plaintiffs note that 15 of the 37 declarations were served on the government on September 12, 2006, in connection with plaintiffs' brief regarding the alleged facial conflict between the injunction and the expedited removal statute. The remaining declarations were obtained approximately three weeks later. Plaintiffs assert that the fact that more than half of the alleged violations occurred after the government had some of the declarations in hand gives rise to an inference that the government has not been complying with the injunction in good faith. Had the government been truly committed to rectifying the problems that underlie the *Orantes* injunction, plaintiffs reason, it would surely have taken steps to solve the problem reflected in the declarations immediately after receiving them on September 12, 2006. Having reviewed the evidence, the court concludes that such an inference does not arise. Even though plaintiffs obtained additional declarations on October 3–4, 2006, the A-files show that the affiants who provided declarations on those dates were processed between September 8 and 22, 2006. Thus, the conduct that the October

court understands the difficulties plaintiffs faced obtaining relevant testimony, it nonetheless concludes that the evidence is not sufficient to show that there has been a meaningful level of non-compliance with the *Orantes* injunction.[47]

### c. Refusal To Provide Advisals To Salvadorans Detained At Ports Of Entry

In an October 2006 *ex parte* application for clarification of an earlier order by the court, the government explained that "[e]ver since the inception of the injunction," it has construed the order to apply only "*between* ports of entry, not *at* ports of entry."[48] At the court's request, the parties addressed the propriety of the government's interpretation of the injunction and whether its refusal to provide advisals at ports of entry constituted a violation of the injunction's terms.

Plaintiffs argue that Salvadorans at ports of entry fall within the class definition, i.e. "all citizens and nationals of El Salvador eligible to apply for political asylum ... who ... have been or will be taken into custody ... by agents of the [Department of Homeland Security]," (*Orantes II*, 685 F.Supp. at 1491), and therefore that such individuals were entitled to receive the advisals mandated by the injunction. Plaintiffs concede that certain portions of the injunction refer specifically to deportation proceedings and voluntary departure—terms that pertained only to aliens between ports-of-entry at the time

the injunction was entered. They assert, however, that the government had a duty to seek clarification from the court before it interpreted the injunction to deny advisals to Salvadorans detained at ports of entry.[49] The government acknowledges that the class definition is sufficiently broad to include Salvadorans at ports of entry, but cites the repeated references in the injunction and the *Orantes* opinions to deportation and voluntary departure.

Having reviewed the *Orantes* opinions, the injunction, and the court's files regarding earlier proceedings before Judge Kenyon, the court agrees that Judge Kenyon was concerned primarily with abuses visited upon Salvadorans apprehended within the United States and detained for processing between ports of entry. Judge Kenyon heard evidence that INS agents had a pattern and practice of coercing Salvadorans to sign voluntary departure forms—forms that were used only when the INS processed aliens between ports of entry. This focus was consistent with the statistics available regarding the apprehension of Salvadorans in the United States. In 2006, over 40,000 Salvadorans were processed between ports of entry, compared with 1,343 at ports of entry.[50] The government represents that these numbers were even more heavily weighted toward apprehension between ports of entry in the 1980s.[51] As a result, paragraph two of the *Orantes* injunction required the

---

affiants address occurred before the government received the first set of declarations on September 12, or within a few days of receipt, and in no event more than 10 days after receiving the declarations. The government's inability to address non-compliance issues within this limited time frame does not give rise to a general inference that it has not attempted in good faith to comply with the *Orantes* injunction.

**47.** The parties' evidence regarding the government's compliance with ICE detention

standards is also relevant in assessing the government's compliance with the *Orantes* injunction. This evidence is discussed *infra*.

**48.** *Ex Parte* Application for Reconsideration and Clarification at 3:24–26 (emphasis original).

**49.** RT, Dec. 20, 2006, at 29:8–30:9.

**50.** Mardo Decl., ¶ 13; Morris Decl., ¶ 6.

**51.** RT, Dec. 20, 2006, at 57:9–14.

government to "inform the class member of his or her rights to request a deportation hearing. . . . For those class members who [were] informed of the availability of voluntary departure pursuant to 8 U.S.C. § 1252(b), such notice [was to] be given before voluntary departure [was] discussed." [52]

Before 1996, the government could not have advised Salvadorans at ports of entry of their right "to request a deportation hearing," because class members at ports of entry had no such right. Instead, Salvadorans at ports of entry were placed in exclusion proceedings. It is clear, therefore, that the government's interpretation was consistent with letter of the injunction, at least until 1996, when Congress erased the distinction between deportation and exclusion proceedings. See FED.R.CIV. PROC. 65(d) (an injunction "shall be specific in terms [and] shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained").

The fact that the evidence Judge Kenyon heard focused primarily on Salvadorans apprehended between ports of entry does not mean that, had he been asked, Judge Kenyon *would* have excluded Salvadorans detained at ports of entry from its scope. The purpose of the injunction was to prevent the "dire consequences" likely to result if Salvadorans were erroneously deprived of their right to apply for asylum. These dire consequences existed whether class members were apprehended at or between ports of entry. By unilaterally refusing to provide *Orantes* advisals to class members at ports of entry, and failing to seek clarification from Judge Kenyon as to whether this was consistent with the intent of his order, the government arguably violated the spirit of the injunc-

tion. This casts some doubt on the government's assertion that it has complied with the injunction in good faith and that it is committed to ensuring that aliens are not removed without adequate notice of their rights. See, e.g., *St. John v. McElroy*, No. 95 CIV. 9810(KMW), 1996 WL 49956, *3–4 (S.D.N.Y. Feb.6, 1996) (INS' failure to comply with the spirit of the court's injunction, even if it was technically in compliance with the strict letter of the injunction, was "some evidence, although not dispositive evidence, that the INS [was] not complying with [the] court's directives in good faith").

The court's doubts regarding the government's good faith compliance with the advisal are compounded by its failure to seek clarification of the scope of the injunction following Congress' enactment of IIRIRA, which eliminated the distinction between deportation and exclusion proceedings. The government acknowledges it could have sought clarification when the statute was passed. It contends, however, that its failure to do so does not evidence bad faith. As enacted by Congress, the expedited removal statute applies to all nationalities except Cubans. When the expedited removal program went into effect, the INS proceeded to place all nationalities other than Cubans in expedited removal, "and it wasn't until later that there was really an observation that . . . putting Salvadorans in expedited removal [might be inconsistent with the *Orantes* injunction." [53] At that time, the government asserts that it "in good faith . . . interpreted the injunction to say no, there's nothing inconsistent about it." [54] This interpretation, of course, was based on a narrow construction of the injunction, not one consistent with its spirit or remedial purpose.

**52.** *Orantes* Injunction, ¶ 2.

**53.** RT, Dec. 20, 2006, at 62:7–24.

**54.** *Id.*

The government's interpretation of the injunction was not so unreasonable, however, as to have justified contempt sanctions, had plaintiffs sought them. Rather, the fact that the injunction used terms that related only to proceedings between ports of entry compels the conclusion that, at least initially, the government did not violate the letter of the order by failing to give advisals to Salvadorans at ports of entry. Once IIRIRA passed, however, the injunction used terms that no longer had legal meaning, and the government should have sought clarification from the court. The government's narrow interpretation of the injunction in the first instance, and its failure to obtain clarification once the distinction between deportation and exclusion proceedings was eliminated, cast doubt on the government's assertion that it has complied with the injunction in good faith and reformed its practices to ensure that all aliens receive notice of their rights.

### d. Conclusion Regarding The Government's Compliance With The *Orantes* Injunction

Under *Rufo,* the government's compliance with the *Orantes* injunction is a relevant, but not dispositive, factor in the dissolution inquiry. That there have been no enforcement actions for 18 years weighs in favor of dissolution. This is offset, however, by anecdotal evidence that the government has failed to provide advisals to Salvadorans between ports of entry, and by the government's unilateral decision not to provide advisals to Salvadorans at ports of entry. Viewing the entire record, it appears evidence of the government's compliance with the advisal requirement is mixed. Because the court considers compliance merely one factor to be weighed in determining whether changed circumstances warrant dissolution of the injunction, this is not fatal to the government's case. It does, however, demonstrate that the remaining evidence regarding the continued need for the advi-

sal must be carefully reviewed, as the court cannot presume that the government has made consistent good faith efforts to comply with the requirement that it provide an advisal of rights to Salvadorans who are detained.

### 2. Advisal Of Rights

The *Orantes* injunction requires that the government give Salvadoran aliens detained by immigration authorities an advisal of rights. Until recently, this advisal informed Salvadoran detainees that they had the right to apply for asylum, to be represented by an attorney, and to request a removal hearing before an immigration judge. In November 2006, the court issued an order modifying the advisal for Salvadorans placed in expedited removal proceedings. The revised advisal informs Salvadorans that they have the right to apply for asylum; it also notifies them that they have contingent rights—to be represented by an attorney and to request a removal hearing before the immigration judge—if, and only if, they establish a credible fear of persecution.

According to the government, Form I–826 (given to aliens in § 240 proceedings) and Form I–867 (given to aliens in expedited removal proceedings) obviate the need for the *Orantes* advisal. The court examines each form in turn.

### a. Section 240 Proceedings

Form I–826, given to aliens placed in § 240 proceedings, contains three sections: "notice of rights," "request for disposition," and "certification of service." The "notice of rights" advises aliens of their right to attorney representation and to request a hearing before an immigration judge:

"You have been arrested because immigration officers believe that you are illegally in the United States. You have the right to a hearing before the Immigration Court to determine whether you

may remain in the United States. If you request a hearing, you may be detained in custody or you may be eligible to be released on bond, until your hearing date. In the alternative, you may request to return to your country as soon as possible, without a hearing. [¶] You have the right to contact an attorney or other legal representative to represent you at your hearing, or to answer any questions regarding your legal rights in the United States. Upon your request, the officer who gave you this notice will provide you with a list of legal organizations that may represent you for free or for a small fee. You have the right to communicate with the consular or diplomatic officers from your country. You may use a telephone to call a lawyer, other legal representative, or consular officer at any time prior to your departure from the United States." [55]

This notice is followed by a "request for disposition," which requires that the alien check and initial one of three options: (1) "I request a hearing before the Immigration Court to determine whether or not I may remain in the United States"; (2) "I believe I face harm if I return to my country. My case will be referred to the Immigration Court for a hearing"; (3) "I admit that I am in the United States illegally, and I believe I do not face harm if I return to my country. I give up my right to a hearing before the Immigration Court. I wish to return to my country as soon as arrangements can be made to effect my departure. I understand that I may be held in detention until my departure." [56]

A third section, the "certification of service," requires that the immigration officer indicate whether the notice was (a) read by the alien or (b) read to the alien in English or another language. [57] Plaintiffs argue that the form is inadequate because it does not advise aliens of their right to apply for asylum. The government acknowledges that Form I–826 does not use the word "asylum." It contends, however, that the form communicates the substance of the right to asylum by making clear, in simple and easy-to-understand language, that an alien who "face[s] harm" in his or her home country may exercise his or her right to "request a hearing ... to determine whether or not [he or she] may remain in the United States."

The court agrees with the government that the word "asylum" need not appear in an advisal in order adequately to inform aliens of their right to apply for asylum. See *Orantes II*, 685 F.Supp. at 1499 ("The language used in the current [pre-*Orantes* ] advisal is too complicated for many Salvadorans to comprehend"). It notes, however, that Form I–826 is potentially confusing in that it does not directly state that an alien who fears return to his or her country is entitled to a hearing before a judge who will determine whether the alien can remain in the United States. An individual reading the form will understand that there is a right to a hearing on fear of persecution only if he is able to link two concepts. The first of these, which appears in the "notice of rights," is that he has a right to a hearing before the Immigration Court to determine whether he may remain in the United States. The second, which is found in the "request for disposition," is that his case will be referred to the Immigration Court if he fears harm in his home country. Compare *Orantes II*, 685 F.Supp. at 1505–06 (finding that Form I–274 was inadequate because it "communicates no information regarding [the] availability of asylum or that having a

55. Mot., Exh. G (Form I–826).

56. *Id.*

57. *Id.*

well-founded fear or persecution entitles the individual to reside in the United States to pursue an asylum claim. Nor does the I–274 inform class members that they can raise asylum as a defense in a deportation hearing. In stating that a deportation hearing is for the purpose of determining whether the alien is illegally in the country, without ever suggesting the possibility of raising political asylum in such a hearing, the I–274 suggests to the class members who know they are in the United States illegally that the outcome of such a hearing is a foregone conclusion. But for the injunction in this case, agents would provide no information about raising asylum in a deportation hearing...").

The court need not decide whether this deficiency is so substantial that it renders Form I–826 inadequate to advise aliens of their right to apply for asylum, however, because the government has failed to meet its burden of showing that the form is properly administered at ports-of-entry and border patrol stations. The government has submitted no evidence to show that Form I–826 is actually given to aliens; nor has it submitted evidence that the form is translated and read to aliens if they cannot read it themselves. As plaintiffs argued at the December 20, 2006 hearing, "this case was never about the

forms used .... It was about on-the-ground practices." [58] Without proof that the form is effective *in practice*, the court cannot conclude that "on-the-ground" practices have changed so much that the *Orantes* advisal is no longer necessary to ensure that aliens in § 240 proceedings understand they have the right to apply for asylum. See *Augustin v. Sava*, 735 F.2d 32, 38 (2d Cir.1984) (holding that an alien was denied procedural rights "where the translation of the asylum application was nonsensical, the accuracy and scope of the hearing translation are subject to grave doubt," and the alien "misunderstood the nature and finality of the proceeding"); *American Immigration Lawyers Ass'n v. Reno*, 18 F.Supp.2d 38, 55 (D.D.C.1998) ("a system that provides information that the recipient does not understand cannot be considered to be providing adequate notice"), aff'd., 199 F.3d 1352 (D.C.Cir.2000).[59]

**b. Expedited Removal Proceedings**

Form I–867A/B, given to aliens in expedited removal proceedings, is read verbatim to aliens.[60] The first portion, Form I–867A, states in part:

"This may be your only opportunity to present information to me and the Immigration and Naturalization Service to

---

**58.** RT, Dec. 20, 2006, at 38:11–13.

**59.** Plaintiffs in *American Immigration Lawyers Ass'n v. Reno* challenged the expedited removal program in part on the grounds that the statute did not ensure that aliens received competent translation services and thus were forced to sign forms they did not fully understand. *American Immigration Lawyers Ass'n*, 18 F.Supp.2d at 55. Noting that the Interim Regulations required interpreters during secondary inspection, the court characterized plaintiffs' claim as an a challenge to the agency's unwritten polices and practices. *Id.* Because IIRIRA expressly limits systemic challenges to written policy directives, guidelines, and procedures, the court concluded that it did not have jurisdiction to hear plain-

tiffs' attack on the agency's unwritten policies regarding use of translation services. *Id.* at 57–58 (citing INA, § 242(a)(3)(A)(ii)). No similar jurisdictional issue is presented here, as the court does not review the adequacy of the government's forms in response to a systemic attack on the procedures and protections afforded aliens. Rather, it assesses only whether the protections constitute changed circumstances *demonstrating that the Orantes* advisal is no longer necessary to remedy practices identified by Judge Kenyon in *Orantes I* and *II*.

**60.** Pursuant to ICE regulations, "[t]he examining immigration officer shall read (or have read) to the alien all information contained on Form I–867A." 8 C.F.R. § 235.3(b)(2)(i).

make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

\* \* \* \* \* \*

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear." [61]

Following these statements is a question-and-answer section, Form I–867B, which requires that the officer ask the alien a series of questions and record the answers. Among the questions asked are the following: "Why did you leave your home country or country of last residence?"; "Do you have any fear or concern about being returned to your home country or being removed from the United States?";

"Would you be harmed if you are returned to your home country or country of last residence?"; and "Do you have any questions or is there anything else you would like to add?" [62]

When aliens in expedited removal are referred for a credible fear interview, they are given Form M–444, which explains that they have the right to consult with other people before the interview, and that a "person of [the alien's] choosing" may be present during the interview. The form also advises the aliens that "[t]he purpose of the credible fear interview is to determine whether [they] might be eligible to apply for asylum." It also states that "[i]f the asylum officer determines that you do not have a credible fear of persecution or torture you may request to have that decision reviewed by an immigration judge." [63]

The evidence shows that Form I–867A/B, at least, is a highly effective instrument when properly administered. A February 2005 study conducted by the United States Commission of International Religious Freedom ("USCIRF") [64] found that the likelihood of referral for a credible fear interview increased sevenfold when paragraph four of I–867A was read to an alien.[65] The likelihood of referral roughly doubled for each fear question asked;

**61.** Mot., Exh. R (Form I–867A).

**62.** *Id.*

**63.** Mot., Exh. T (Form M–444). The primary difference between the *Orantes* advisal and the combination of Forms I–867 and M–444 is the fact that Form M–444 is not given to the alien until he or she is referred for a credible fear interview. Unlike Salvadorans who receive the *Orantes* advisal, therefore, aliens who receive Form I–867 must decide whether or not to apply for asylum not knowing that they have the right to a hearing and to representation if they are able to establish that they have a credible fear of persecution. Plaintiffs argue that this difference makes Forms I–867 and M–444 inadequate substitutes for the *Or-*

*antes* advisal. The court need not address this argument, as it concludes that the government has failed to meet its burden of showing that the forms are actually provided to Salvadorans in a way that ensures they are understood.

**64.** Declaration of Ranjana Natarajan in Support of Plaintiffs' Memorandum of Points and Authorities Regarding the Court's Jurisdiction over Expedited Removals ("Natarajan Decl."), Exhs. 5–6.

**65.** *Id.*, Exh. 6 at 162. When cases from San Ysidro are excluded, the "associations between reading [this] paragraph[] and referral showed a similar pattern of results, although the associations were no longer statistically

thus, the likelihood of referral was four times greater for individuals who were asked both fear questions than for those who were asked neither question.[66] These findings suggest that, properly used, the forms effectively advise aliens in expedited removal of their right to apply for asylum.

Even the most effective form is useless if it is not administered, however. Citing the USCIRF study, plaintiffs argue that "[o]fficers conducing expedited removal often violate the governing regulations and routinely short-cut procedures." [67] In particular, they allege that officers frequently neglect to read Form I–867's advisal regarding the availability of asylum.

The USCIRF study involved personal and video observations of secondary inspection interviews at seven sites—Atlanta Hartsfield International Airport, Houston International Airport, John F. Kennedy International Airport, Los Angeles International Airport, Miami International Airport, Newark Liberty International Airport, and the San Ysidro Border Station—as well as follow-up interviews with aliens after they completed secondary inspection but before they learned of the final disposition of their case.[68] In all, researchers reviewed 443 secondary inspections.[69] Because the study does not identify the nationalities of the aliens who were interviewed, the court cannot determine whether, or to what extent, its findings apply to Salvadoran class members.

The USCIRF researchers found that the length of secondary inspection interviews varied. On average, officers spent 18 minutes interviewing aliens at the San Ysidro office, although observers recorded interviews that ranged from a low of 3 to a high of 150 minutes. By comparison, officers at the Houston port of entry spent an average of 2 hours and 53 minutes with each alien; interviews there ranged from 79 to 380 minutes.[70] Based on their observations, the researchers found the following: [71]

| Item Read or Paraphrased | Atlanta | Houston | Los Angeles | Miami | Newark | San Ysidro | Total |
|---|---|---|---|---|---|---|---|
| I–867A: ¶ 4 (asylum) | 35 (89.5%) | 23 (95.8%) | 11 (68.8%) | 86 (96.6%) | 13 (46.4%) | 17 (9.7%) | 164 (44.1%) |
| I–867B: Why did you leave . . . ? | 34 (91.4%) | 20 (87.0 %) | 17 (85.0%) | 71 (98.6%) | 25 (83.3%) | 157 (88.2%) | 325 (89.8%) |
| I–867B: Do you have any fear . . . ? | 34 (89.5%) | 20 (87.0%) | 17 (85.0%) | 71 (98.6%) | 25 (83.3%) | 157 (88.2%) | 336 (94.1%) |
| I–867B: Would you be harmed . . . ? | 34 (89.2%) | 20 (83.3%) | 17 (85.0%) | 70 (98.6%) | 26 (86.7%) | 144 (82.8%) | 311 (87.1%) |
| I–867B: At least one fear question asked | 34 (91.4%) | 22 (91.6%) | 18 (90.0%) | 95 (96.7%) | 29 (96.7%) | 159 (94.4%) | 362 (95.0%) |

As can be seen, DHS officers varied in their adherence to the regulations' requirement that they read Form I–867 to aliens in expedited removal proceedings. At all six sites, INS officers asked the two "fear" questions most or nearly all of the time.

significant because of the reduced sample size." (*Id.* at 162).

66. *Id.* at 162–63.

67. Opp. at 13:4–5.

68. Natarajan Decl., Exh. 6 at 150.

69. *Id.,* Exh. 6 at 151 tbl. 1.1.

70. *Id.* at 151.

71. *Id.* at 159 tbl. 2.2.

Researchers, however, observed far greater variation in the frequency with which DHS officers read paragraph four of Form I–867A, which informs aliens of the availability of political asylum.[72]

Particularly striking are the study's findings regarding practices at the San Ysidro port-of-entry. Although 94.4 percent of aliens at San Ysidro were asked at least one of the two "fear" questions, and the overwhelming majority were asked both questions, only 9.7 percent were read paragraph four, which advises *aliens of their right to apply for asylum.* The study does not reveal whether the "fear" questions are equally effective when asked without the context provided by paragraph four; the court can infer, however, that an alien who understands that he may obtain asylum in the United States if he has a fear of returning to his home country will more readily comprehend the purpose of the "fear" questions.

**72.** Plaintiffs also cite the USCIRF study's finding that A-files sometimes indicated an alien's response to the "fear" questions even though observers reported that the questions had not been asked:

| | Observation | | A–File Review | |
|---|---|---|---|---|
| | Question Read | Question Not Read | Response In A–File | No Response In A–File |
| I–867B: Do you have any fear...? | 336 (94.1%) | 21 (5.9%) | 379 (95.2%) | 19 (4.8%) |
| I–867B: Would you be harmed ...? | 311 (87.1%) | 46 (12.9%) | 379 (95.2%) | 19 (4.8%) |
| I–867B: At least one fear question asked | 362 (95.0%) | 19 (5.0%) | 379 (94.8%) | 21 (5.3%) |

(Natarajan Decl., Exh. 5 at 159 tbl. 2.1). Plaintiffs contend that these inaccuracies are particularly troubling because first-line supervisors often rely exclusively on "paper reviews." (See, e.g., Deposition of Matthew J. Calmes, Supervisory Border Patrol Agent, Imperial Beach Border Patrol Station, San Diego Section ("Calmes Depo.") at 54:20–55:4 ("I review the casework to make sure it's complete, all the I's are dotted and the T's are crossed, to make sure all the casework is done up to par. Use the checklist to ensure that everything is done properly. And I—once everything is done properly, I sign the case in my place, and then I sign the checklist, and it's referred to my supervisor for review and signature")).

Plaintiffs appear to argue that DHS safeguards do not work so well in practice as in theory. Although both a first-line and second-line supervisor must review and sign off on every file before an expedited removal order can be issued, plaintiffs imply that the utility of these reviews is necessarily limited by the quality of the paperwork prepared by the secondary inspector. This inference is rebutted to some extent by the testimony of John McLaughlin, a first-line supervisor. McLaughlin confirmed that he typically limits his review to the "paperwork" prepared by the inspector, but added that he sometimes interviews aliens directly "where something ... doesn't make sense or [where he] just wanted to get clarification ... or sometimes the agent is having a difficult time either understanding or getting [an alien] to understand." (Deposition of John McLaughlin ("McLaughlin Depo.") at 75:8–16). It appears uncontested, however, that supervisors' primary duties are to review the paperwork for errors, not to conduct a new secondary inspection.

Evidence regarding the review process is only tangentially related to the court's inquiry. It would, of course, be problematic if the statistics showed that CBP agents routinely misrepresented or falsified aliens' answers to the fear questions. The statistics, however, do not lend themselves to this interpretation. It is possible, for example, that CBP agents simply assume that the answer to the second fear question is "yes" if the answer to the first is "yes," and record such an answer even though they do not ask the second question. Without further information regarding the specific responses recorded, it is not possible to infer from the small percentage differentials found that CBP agents are falsifying responses to the detriment of aliens who might otherwise have good faith asylum claims. While the statistics tend to suggest that the effectiveness of the first- and second-line reviews is limited by the accuracy of the answers recorded by the secondary inspector, the primary focus of the present inquiry is whether the form is appropriately administered. The statistics show that in the vast majority of cases, it is. The fact that the DHS has implemented two layers of additional review suggests that it has made substantial efforts—if imperfect efforts—to ensure that aliens are not removed erroneously.

Although the government suggested at the hearing on this motion that San Ysidro's compliance rates reflected the practices of one, isolated port-of-entry, the evidence supports a different conclusion. San Ysidro personnel reported to USCIRF researchers that CBP staff "periodically show[ed] an information video that contain[ed] I–867A content (in both Spanish and English) to aliens awaiting Secondary Inspection in lieu of reading the information." [73] Officers were expected to read the I–867A to aliens whenever the video was not shown, the staff members said.[74] Were this true, the court might conclude that San Ysidro personnel had adopted the video as a as a creative, albeit improper, solution to the time pressures of processing large numbers of aliens through the port-of-entry. The facts are not so benign, however.

In response to the court's request for a copy of the video, the government submitted two informational videos: the video shown during the USCIRF study in 2004 and the one shown today. An accompanying declaration by Paul Cannon, a Watch Commander at the San Ysidro port of entry, asserts that "it has never been the policy at the San Ysidro port of entry to show an informational video in lieu of hav- ing Form I–867A/B read aloud during administration of the sworn statement." [75] Indeed, Cannon states, he "ha[s] never observed and do[es] not know of any instances where an alien was shown the . . . videos in lieu of having Form I–867A/B read aloud." [76] Rather, the informational video "describ[es] the inspection process and provid[es] safety information regarding the dangers associated with crossing the border illegally." [77] It is meant to "supplement, and not to supplant, existing immigration inspections processing." [78] As can be seen, Cannon represents, contrary to the representations that San Ysidro personnel made to USCIRF researchers, that the video has never been used to advise aliens awaiting expedited removal of their right to apply for asylum.

The evidence regarding the video suggests that the San Ysidro personnel interviewed by USCIRF researchers may have mischaracterized the video, so that they would not have to admit that their practices were deficient and take steps to remedy the problem. As Cannon states that the video was never meant to substitute for an oral advisement of the right to apply for asylum, the evidence confirms the US- CIRF's finding that only one in ten aliens processed through San Ysidro was properly informed of his or her right to apply for asylum.[79]

73. *Id.* at 160.

74. *Id.*

75. Declaration of Paul Cannon re Videos Used at San Ysidro ("Cannon Decl."), ¶ 7.

76. *Id.,* ¶ 8.

77. *Id.,* ¶ 6.

78. *Id.,* ¶ 10.

79. In support of its motion for amendment and reconsideration under Rule 59(e) of the Federal Rules of Civil Procedure and Local Rule 7–18, the government provided, on June 20, 2007, an English translation of the video used at San Ysidro. Approximately 2:30 minutes into the 8:15 minute video, there is a 45– second segment informing viewers that "United ed States law provides that any person facing persecution, harm, or torture in his or her country of origin shall be protected. By virtue of the above, if you fear returning to your country for these reasons, you should notify the official handling your case, given that it will be the only opportunity that you will have to lay out the problem. In such a case as this, you will have the opportunity to speak confidentially to an official. After hearing from you, the same official shall determine whether sufficient grounds exist for you to remain in the country." (Rule 59(e) Mot., Becker Decl., Exh. 1 at 11). For several reasons, this 45– second segment is an inadequate substitute

This statistic is particularly important given the large numbers of aliens who are processed through the San Ysidro port-of-entry. Between 2000 and 2003, San Ysidro alone processed 38 percent of all aliens placed in expedited removal proceedings;[80] this makes it the single busiest port-of-entry in terms of numbers of aliens removed through the expedited removal program. In this context, the low compliance rates at San Ysidro are quite significant, and belie any suggestion that the USCIRF's findings should be dismissed as reflecting the isolated practice of a single, renegade port-of-entry.

for paragraph four of Form I–867A. First, it is buried in the middle of a video that addresses a variety of unrelated issues, and that devotes almost three minutes to a graphic presentation of the physical dangers of entering the United States illegally. Second, like Form I–274, it fails to make clear that an individual who fears persecution may be able to remain in the United States based on that fear. Instead, the video advises aliens only that they "shall be protected" if they fear persecution. (Compare also Form I–867A ("That officer will determine whether you should remain in the United States and not be removed because of that fear") with Rule 59(e) Mot., Becker Decl., Exh. 1 at 11 ("After hearing from you, the same official shall determine whether sufficient grounds exist for you to remain in the country")). Finally, as plaintiffs note, it is reasonable to infer that the video, which plays on a continuous loop in a waiting room and conveys numerous messages designed to discourage undocumented migrants from entering the United States illegally, quickly becomes "background noise" for many people, and is far less effective than the one-on-one oral advisal contemplated by Form I–867A.

80. The court calculated this figure based on two statistics reported in the USCIRF study: (1) San Ysidro accounted for 43.8 percent of all expedited removals at land/sea (i.e., non-airport) ports-of-entry between 2000 and 2003 and (2) airport arrivals made up only 12 percent of aliens placed in expedited removal proceedings. (Natarajan Decl., Exh. 5 at 94).

This conclusion is not affected by the government's assertion that it took "immediate steps" to address the concerns raised by the USCIRF study.[81] The USCIRF's lead recommendation was that the DHS "create an office—headed by a high-level official—authorized to address . . . issues relating to asylum and expedited removal."[82] Secretary Chertoff implemented this recommendation in July 2005, when he appointed a Senior Refugee and Asylum Advisor.[83] The government submits no evidence, however, that any of the study's other recommendations were implemented. Nor does it assert that the recommendations are under study for possible adoption.[84]

81. Reply at 27:11–12. See also Reply, Exh. AA (Letter from Michael J. Hrinyak to Mark Hetfield, Feb. 2, 2005) (commenting on aspects of the USCIRF study); Reply, Exh. Z (Letter from Michael J. Hrinyak to Mark Hetfield, Jan. 21, 2005) (same); Reply, Exh. Y (Letter from Michael J. Hrinyak to Mark Hetfield, Jan. 7, 2005) (same).

82. Natarajan Decl., Exh. 5 at 70.

83. *USCIRF Welcomes Secretary Chertoff's Creation of a Senior Refugee and Asylum Advisor,* July 19, 2005, available at www.uscirf.gov/mediaroom/press/2005/july07192005_uscirf.html.

84. The study made five overarching recommendations: (1) create an office headed by a high-level official to address issues relating to asylum and expedited removal; (2) give asylum officers authority to grant asylum claims during credible fear interviews; (3) establish detention standards and conditions appropriate for asylum seekers, including regulations that will ensure effective implementation of existing parole criteria governing the release of asylum seekers pending final adjudication of their claims; (4) expand existing private-public partnerships to facilitate legal assistance for asylum seekers and improve administrative review and quality assurance procedures; and (5) implement and monitor quality assurance procedures, e.g., a computerized system to track real-time data on aliens and use of videotaping to record all secondary interviews. (Natarajan Decl., Exh. 5 at 126–38).

Instead, the government offers evidence that, in response to the USCIRF's findings, DHS' Management Inspections Division ("MID") accelerated its review of the expedited removal procedures used by the Office of Field Operations ("OFO") and the Office of Border Patrol ("Border Patrol").[85] The MID's multi-stage review is described in a declaration submitted by its Director, John J. Rooney. Rooney reports that, in Spring 2006, the division reviewed alien files ("A-files") for each Border Patrol station placing relatively large numbers of aliens in expedited removal proceedings. After reviewing the A-files, four MID inspectors traveled to Border Patrol Stations in four Texas and Arizona locations, where they interviewed Border Patrol agents and observed 31 Border Patrol agents process 40 expedited removal cases.[86] After reviewing 181 A-files, interviewing the 31 Border Patrol agents, and observing 40 expedited removal cases, the MID inspectors "found no evidence that Border Patrol agents improperly encouraged or coerced asylum seekers to withdraw their application[s] for admission," or that they otherwise "failed to refer aliens who expressed fear of persecution to an asylum officer for a credible fear interview."[87] The inspectors also "identified no substantive viola-

tions of U.S. Customs and Border Protection ("CBP") procedures by Border Patrol agents that affected the due process rights of aliens apprehended by Border Patrol."[88] Inspectors reached identical conclusions in a separate review of OFO procedures; this review involved studying 223 A-files, interviewing 10 CBP officers, and observing the processing of 27 aliens through expedited removal at five ports-of-entry, including San Ysidro, California.[89]

These generalized statements provide little information concerning the concrete findings of the review. Rooney does not identify the deficiencies that were found; he offers only the conclusory assertion that there were no "substantive violations" that "affected the due process rights of aliens apprehended by the Border Patrol."[90] Rooney does not indicate whether the review determined that paragraph four of Form I–867A had been read to most aliens whose files were reviewed. Nor does he address whether it is the regular practice of Border Patrol and CBP officers to read the entire Form I–867A/B to the aliens they process. The fact that the government has implemented regular reviews and automated inspection programs is a positive development.[91] Without further evidence of the results of the inspections,

---

**85.** Declaration of John J. Rooney ("Rooney Decl."), ¶¶ 2, 5. The OFO is responsible for processing individuals seeking entry into the United States through ports of entry, while the Border Patrol is charged with detecting and preventing the illegal entry of aliens into the Untied States between ports of entry. (*Id.*, ¶ 2).

**86.** *Id.*, ¶¶ 10–16.

**87.** *Id.*, ¶¶ 17–18.

**88.** *Id.*, ¶ 19.

**89.** *Id.*, ¶¶ 26, 28. As of December 7, 2006, the MID was in the process of completing its review; Rooney anticipates future reviews on a regular basis. (*Id.*, ¶¶ 6–7).

**90.** *Id.*

**91.** The MID has instituted a "self inspection program," which requires Border Patrol Agents in Charge to complete annual worksheets regarding operation of the expedited removal program at their Border Patrol Stations. Each Agent in Charge must also review a random sample of five expedited removal cases processed during the review period. If the Agent in Charge identifies any deficiencies, including deficiencies in proper completion of the relevant forms, he or she must flag the procedural deficiency and take corrective action. An automated system tracks further deficiencies in agents' handling of the flagged procedures until the problems are corrected. (*Id.*, ¶¶ 30–39).

however, the court simply has no basis upon which to conclude that the adoption of Forms I–826, I–867A/B, and M–444 has changed the circumstances surrounding the processing of aliens so significantly that the *Orantes* advisal is no longer necessary to ensure that Salvadorans are routinely notified of their right to apply for asylum.[92]

### c. Conclusion Regarding Advisal Of Rights

Having reviewed the parties' evidence, the court concludes that the government has not met its burden of establishing changed circumstances respecting its practice of advising aliens of their right to apply for asylum. Although the government has adopted new forms and regulations to ensure that aliens are not removed unless they understand their right to apply for asylum, it has submitted no evidence that the forms are actually used in practice. The government has proffered no evidence whatsoever from which the court can infer that Form I–826 is actually administered to aliens placed in § 240 proceedings, or that aliens who sign the forms are actually given an opportunity to understand what it is they are signing. The only evidence regarding Forms I–867 and M–444, which are used in expedited removal, was placed in the record by plaintiffs. This evidence shows that Form I–867, in particular, represents a thoughtful effort to ensure that aliens are not subject to expedited removal orders without understanding that they have a right to apply for asylum. The evidence regarding use of the form, however, raises substantial concerns. While these concerns focus primarily on the San Ysidro port-of-entry, the heavy traffic of aliens through that entry point magnifies the deficiencies there. As a result, the court cannot conclude that the

---

**92.** As evidence that the advisal remains necessary, plaintiffs cite instances of "aggressive or intimidating" behavior by CBP officers during secondary inspection. USCIRF researchers noted several types of behavior while observing agents. Some were aggressive or intimidating, others helpful or soothing.

| Aggressive or Intimidating Behaviors Observed During Secondary Inspection | | |
|---|---|---|
| Behavior | All cases | Cases referred for credible fear |
| Raising voice | 41 (10.4%) | 13 (19.7%) |
| Interrupting | 40 (10.1%) | 10 (15.2%) |
| Grabbing/threatening touches | 1 (0.3%) | 0 |
| Accusations | 28 (7.1%) | 4 (6.1%) |
| Verbal threats | 20 (5.1%) | 2 (3.0%) |
| Sarcasm/Ridicule | 37 (9.4%) | 7 (10.6%) |
| Being demanding | 36 (9.1%) | 5 (7.6%) |
| Standing over alien | 9 (2.3%) | 1 (1.5%) |
| Leaving room without explanation | 63 (15.9%) | 9 (13.6%) |
| Helpful Behaviors Observed During Secondary Inspection Interviews | | |
| Offering comforting words | 41 (10.4%) | 8 (12.1%) |
| Friendly joking | 61 (15.4%) | 14 (21.2%) |
| Small talk | 44 (11.2%) | 3 (4.6%) |
| Explaining actions | 96 (24.3%) | 16 (24.2%) |

(Natarajan Decl., Exh. 6 at 171 tbls. 5.1 and 5.2). The court accords only minimal weight to this evidence. Although it may seem logical to infer that "aggressive" behavior by CBP agents has the effect of discouraging some aliens from applying for asylum, the statistics do not bear this out. CBP officers "raised their voices" when dealing with almost 20 percent of aliens referred for credible fear interviews, for example. This percentage dropped to 10 percent for "all aliens." It appears, therefore, that "raised voices" may correlate *positively* with referral for a credible fear interview, however illogical that may be. As this example demonstrates, without further context, the court cannot reasonably draw any inferences from the statistics; they are, moreover, not sufficiently robust to be statistically significant.

low rates of compliance at San Ysidro are examples of sporadic or isolated practice. Finally, the court notes that the government's unilateral interpretation of the injunction as exempting Salvadorans at ports-of-entry from the advisal requirement raises doubts regarding its commitment to ensuring that Salvadorans are notified of their right to apply for asylum. Although the country conditions that created such a strong need for the advisal in 1988 have changed, plaintiffs' evidence demonstrates that some Salvadorans continue to have valid claims for asylum today. As earlier noted, while the conditions Salvadorans face if they are denied the right to apply for asylum and are returned to El Salvador are not as severe as those Salvadorans faced in 1988, Judge Kenyon entered the injunction not only to protect Salvadorans from being returned to a country torn apart by civil war, but also to remedy coercive practices by the INS. Because the government has not adduced adequate evidence that the practices that were of concern to Judge Kenyon have been rectified by its promulgation and use of new advisal forms, the court concludes it has not demonstrated that the purposes of the injunction have been fully satisfied. The court accordingly denies the government's motion to dissolve paragraphs 1–3 and 5 of the injunction, which set forth the advisal requirement.

### 3. ICE Detention Standards [93]

The government contends that the injunction is no longer necessary to ensure that coercive conditions and practices at detention centers do not discourage Salva-

dorans from applying for asylum. It states:

"[T]he concerns of INS abuse that gave rise to the injunction are no longer well-founded. Since the entry of the injunction almost two decades ago, the INS and DHS have reviewed and reevaluated their immigration policies, and have reformed the way that they process, detain, and remove illegal aliens.... For most provisions of the injunction that once applied only to Salvadorans, INS and DHS, on their own accord, made the safeguards and protections available to aliens of all nationalities." [94]

The safeguards to which the government refers are set forth in ICE's national detention standards, which were drafted and implemented by defendants many years after the injunction was entered.[95]

The detention standards were developed in November 2000 by the former Immigration and Naturalization Service ("INS") in conjunction with the American Bar Association ("ABA"), the Department of Justice, and various organizations involved in advocacy for and pro bono representation of immigration detainees. Thirty-eight standards govern the operation of detention facilities for aliens who are apprehended for entering the United States illegally; ICE periodically measures detention facility compliance with them. The government argues that seven of the standards parallel provisions of the *Orantes* injunction, and that their implementation, coupled with compliance monitoring by ICE, obviates the need for court supervision through the injunction.[96]

**93.** ICE is the Bureau of Immigration and Customs Enforcement, which is a division of the Department of Homeland Security.

**94.** Mot. at 2, 35.

**95.** *Id.* at 14.

**96.** *Id.* at 15–20. The seven standards at issue govern (1) visitation; (2) telephone access; (3) access to legal materials; (4) special management unit (administrative segregation); (5) special management unit (disciplinary segregation); (6) group presentations on legal rights; and (7) staff-detainee communication.

### a. Enforceability

 Plaintiffs argue that implementation of the standards cannot displace the injunction because the standards are not judicially enforceable. Taken to its logical conclusion, plaintiffs' argument would mean that the *Orantes* injunction could not be dissolved unless the legislature or the courts created a privately-enforceable right to the safeguards provided by the injunction. Nothing in Rule 60(b)(5) or the case law suggests that an injunction cannot be dissolved unless its terms are codified or otherwise made judicially enforceable. In *Dowell*, the Supreme Court held that the court of appeals erred in concluding that "compliance alone cannot become a basis for modifying or dissolving an injunction." *Dowell*, 498 U.S. at 246, 248–49, 111 S.Ct. 630. Were this the case, the Court observed, then "a school district, once governed by a board which intentionally discriminated, [would be condemned] to judicial tutelage for the indefinite future." *Id.* at 249, 111 S.Ct. 630. The Court concluded that such a "Draconian result" was not required by "the principles governing the entry and dissolution of injunctive decrees." *Id.* As *Dowell* instructs, dissolution is sometimes warranted because the enjoined party has complied in good faith with an injunction's provisions. This belies the notion that dissolution is never warranted unless the enjoined party is bound by judicially-enforceable provisions to meet standards identical to those in the injunction. See also *Building & Constr. Trades Council*, 64 F.3d at 888 ("[T]he fact that the party is not subject to a contempt sanction for violation of the decree in addition to the statutory punishment is not generally a factor to be considered [in determining whether an injunction should be dissolved]").

### b. Adequacy Of The Detention Standards

 The parties submitted some 3,000 pages of exhibits that document conditions in ICE detention facilities today. The government contends these documents show that "the concerns of INS abuse that gave rise to the injunction are no longer well-founded. The Government has reformed its practices and has, on its own initiative, voluntarily extended aspects of the injunction that were once imposed on it for Salvadorans, and applied them to all nationalities."[97] The court gives substantial weight to the government's voluntary adoption of detention standards, which are wide-ranging in scope and reflect a good-faith effort to develop a comprehensive system of regulating and reviewing detention facilities.[98] As with the government's forms, however, the mere fact that detention standards exist is, by itself, insufficient to show changed circumstances. The more pertinent question is whether the detention standards have been followed in practice, and have eradicated the detention conditions that caused Judge Kenyon to enter the injunction. To determine the answer to this question, the court has examined in detail the parties' evidence regarding detainee conditions to in an attempt to discern whether the practices that prompted Judge Kenyon to enter the *Orantes* injunction remain extant today. In particular, the court has focused on detention facilities' compliance with standards that duplicate requirements in the *Orantes* injunction.

---

**97.** *Id.* at 30:3–8.

**98.** Plaintiffs take issue with the government's characterization of the detention standards as guidelines that go "far above and beyond the requirements set forth in the injunction" (Reply at 35:7–12), and note that they are merely minimal standards established by the American Correctional Association (RT, Dec. 20, 2006, at 47:17–20).

There are 201 detention centers subject to the ICE detention standards: 8 Service Processing Centers (SPCs), 6 Contract Detention Facilities (CDFs), and 187 state or local facilities, which house ICE detainees for longer than 72 hours and which have entered into Intergovernmental Service Agreements (IGSAs) with the government.[99] To ensure that conditions in these detention centers meet the standards set forth by ICE, ICE instituted the Detention Management Control Program (DMCP) in January 2002 and created the Detention Standards Compliance Unit (DSCU) to conduct annual inspections of the facilities.[100]

The on-site portion of these reviews usually occurs over a period of two to three days, during which inspectors observe facility conditions, interview staff members and detainees, and review documentary evidence such as facility files, records, and invoices.[101] Results are reported on a "conditions of confinement review worksheet" (Form G–324A) and in a written summary prepared by the officer in charge of the review.[102] Form G–324A is an 85–page questionnaire divided into 38 sections that correspond to the 38 detention standards.[103] For each detention standard, the DSCU has developed specific questions to ascertain the facility's compliance with the standard.[104] The questionnaire for the standard governing special management units, or solitary confinement, for example, includes 24 questions. These include whether all cells are equipped with beds, whether detainees receive three nutritious meals a day, and whether the conditions of confinement are proportional to the

**99.** Leroy Decl., ¶ 7. There are an additional 144 IGSAs that house ICE detainees for less than 72 hours. (*Id.*). The detention standards do not apply to these IGSAs, which are subject instead to "abbreviated inspection." (*Id.*, ¶ 9). According to Yvonne Evans, former chief of the DSCU, a small percentage of detainees are also held in Bureau of Prisons facilities. (Pls.' Exh. 9 (Deposition of M. Yvonne Evans ("Evans Depo.") at 24:15–16)).

**100.** Leroy Decl., ¶ 9.

**101.** *Id.*, ¶¶ 9, 12, 15.

**102.** *Id.*, ¶¶ 12, 20.

**103.** *Id.*

**104.** *Id.* Yvonne Evans reports that a facility may be rated "acceptable" on a particular *detention standard* even if some of its practices are out of compliance with one or more of the standard's components. (Pls.' Exh. 9 (Evans Depo. at 108:4–7)). Thus, a reviewer may mark "acceptable" at the end of the questionnaire for the detention standard on "Access to Legal Materials" even though the reviewer has found that the facility's law library does not maintain all of the legal materials listed on Attachment A to the standard, and/or that it does not offer Lexis/Nexis ac-

cess to detainees. (See Pls.' Exh. 19 at D013280, 013284–85 (Field Office Detention Review Worksheet for the Erie County Prison, Erie, Pennsylvania, March 2005)). Evans asserts that reviewers have discretion to determine whether or not a facility is "acceptable," as there are no written rules requiring reviewers to rate a facility "deficient" or "at-risk" if the facility is out of compliance with a certain number of a detention standard's components. (Pls.' Exh. 9 (Evans Depo. at 108:22–109:6)); see also (Pls.' Exh. 14 (Deposition of Adam Garcia) ("Garcia Depo.") at 142:20–25 ("Q: So how do you figure out—if there are a couple of deficiencies in a particular standard, how do you figure out if you're going to mark the standard as acceptable, deficient or at risk? A: Depending on the severity"))). Likewise, individual reviewers must exercise discretion in assessing whether to recommend an overall facility rating of "superior," "good," "acceptable," or "at risk." (*Id.* at 108:7–12). A facility need not be rated "acceptable" on all 38 standards to receive an overall facility rating of "acceptable." (See Pls.' Exh. 14 (Garcia Depo. at 140:9–12 ("Q: So as far as you know, there can be some deficient standards individually and the facility could still be acceptable, right? A: Absolutely"))). All reports and recommendations are reviewed by DSCU staff. (Pls.' Exh. 9 (Evans Depo. at 46–47)).

amount of control necessary to protect the detainees.[105] At the end of each of the 38 sections corresponding to the 38 detention standards, the reviewer selects one of three conclusions: "acceptable," "deficient," or "at risk." [106] The reviewers are then required to rate the facility overall as "superior," "good," "acceptable," or "at risk." [107] Completed reports are reviewed by staff officers at DSCU headquarters.[108] Facilities rated "deficient" or "at risk" are evaluated again within six months; continued noncompliance results in discontinuation of the facility's use.[109] Where reviewers find particularly egregious violations of the detention standards, they may contact the DSCU to discuss immediate remedial measures, including the removal of immigration detainees from a facility altogether.[110]

Representatives from the United Nations High Commissioner for Refugees ("UNHCR") and the ABA also regularly visit detention facilities, observe conditions, interview detainees and staff members, and provide unsolicited reports to ICE concerning their findings.[111] The ABA focuses on legal issues, while the UNHCR examines compliance with international guidelines.[112]

105. Pls.' Exh. 29.

106. Leroy Decl., ¶ 13.

107. *Id.*, ¶ 16.

108. *Id.*, ¶¶ 16–17.

109. *Id.*, ¶ 19.

110. Pls.' Exh. 9 (Evans Depo. at 98:14–25 (recounting an instance in which detainees were removed from a facility in Oklahoma after a reviewer contacted the DSCU regarding "very serious problem[s] in detention standards compliance")); see also Leroy Decl. at 373 (Letter from ICE to UNHCR, July 27, 2004 ("This letter is to confirm receipt of your correspondence dated May 21, 2004, regarding the conditions of confinement at Avoyelles and Tangipahoa Parish Prisons in Louisiana. After a thorough review of our records regarding the issues you raised, a Headquarters review of the facilities was conducted. We concur with your concerns and have taken immediate action to relocate Immigration and Customs Enforcement (ICE) detainees to acceptable facilities")); Office of the Inspector General, DHS, *Treatment of Immigration Detainees Housed at Immigration and Customs Enforcement Facilities* ("OIG Report"), Dec. 2006, at 38 (noting that ICE removed all immigration detainees housed at Passaic County Jail, Paterson, New Jersey and transferred them to other facilities after the OIG completed its review of the facility).

111. Leroy Decl., ¶¶ 21–22; Plaintiffs' Motion to Compel Additional Discovery, Exh. 1 (Declaration of Irena Lieberman ("Lieberman Decl.")); Pls.' Exh. 11 (UNHCR letter, Nov. 22, 2006).

112. Opp. at 18:9–10. The government notes that the UNHCR and ABA visits "are not equivalent to the in-depth inspections conducted by ICE." (Leroy Decl., ¶ 21). The ABA, for example, arranges for visits by delegations that "generally consist[ ] of summer associates and/or attorneys from pro-bono law firms, who have little or no knowledge of the detention industry." (*Id.*, ¶ 23). The visits are relatively short, lasting no more than four hours, and result in reports that "typically lack the details necessary to properly investigate the matter." (*Id.*).

Plaintiffs counter that ICE's facility reviews are flawed because (1) the deposition testimony of two facility reviewers revealed disparities in the way they evaluate facilities; and (2) facilities are given thirty days notice before annual inspections, which permits them to correct deficiencies before the review commences. To demonstrate that reviewers use different standards in evaluating facilities, plaintiffs cite the deposition testimony of Adam Garcia and Kristine Brisson, both ICE officers tasked with conducting field reviews of detention facilities. Asked about the difference between a "deficient" and an "at-risk" rating, Brisson explained that a facility is deficient "if it definitely does not meet a particular standard," while "at-risk" facilities are "in danger or close to ... not meeting a particular standard." (Pls.' Exh. 17 (Deposition of Kristine Brisson ("Brisson Depo.") at 49:19–25)). Asked whether "deficient indicate[d] a more severe violation of a standard than at-risk," Brisson clarified that she was

Plaintiffs assert that reviews by the ABA, UNHCR, and ICE show that "the government has not achieved anything even approaching substantial compliance with the Detention Standards." They contend that unless the government can show that it substantially complies with the standards, their promulgation does not constitute a changed circumstance that warrants dissolution of the injunction.

"not really sure because [she has] never had to mark a facility as being at-risk or repeat finding ... [so she] would have to refer to [her] materials or [her] guide if [she] ever had to mark either one of those boxes." (*Id.* at 50:1–9). Garcia, by contrast, explained that an "at risk" facility is "a little more than deficient, [i.e.,] at risk of failing," while a "deficient" facility is "[a] little behind, the problem can be corrected in a timely manner." (Pls.' Exh. 14 (Garcia Depo. at 136:9–17)).

The DMCP guidelines indicate that a "deficient" rating describes a facility where "[o]ne or more detention functions are not being performed at an acceptable level. Internal controls are weak, thus allowing for serious deficiencies in one or more program areas." (Leroy Decl. at 393 (DMCP Policy and Procedure)). Despite this guideline, the testimony of the ICE reviewers demonstrates they implement the standards in very different ways. The inconsistencies in practice suggest that there may be merit to plaintiffs' assertion that the reviews "may severely under-report non-compliance with the detention standards." (Opp. at 19:12–19).

The inconsistencies extend to reviewers' decisions as to whether particular conditions constitute violations of a standard. At his deposition, Adam Garcia explained that he had marked "Yes" next to a detention standard component that read, "The official authorizing censorship or rejection of outgoing mail provides the detainee with signed written notice," even though his notes indicated that detainees were *not* always provided with written notice. (Pls.' Exh. 14 (Garcia Depo. at 163:1–11)). In the review sheet's "remarks" section, he wrote: "Detainee will be notified if outgoing mail is rejected, not always with a written notice." (*Id.* at 163:7–11). Garcia marked the answer "yes" and not "no" because he felt that the facility had met the spirit of the standard by notifying the detainee, even though the notification was sometimes oral. (*Id.* at 164:3–17). He marked "no" next to the component, "Mail is returned. No written notice is given to either the addressee or sender," because he felt lack of notice regarding incoming mail was a more serious problem. (*Id.* at 164:18–23 ("Whereas, [compared with the detention standard component requiring officials rejecting outgoing mail to provide detainees with signed written notice,] ... you thought, well, that's pretty important when [incoming] mail is returned and there's no written notice given to anybody and so, therefore, I think that's serious enough that I'm going to put a no? A: Yes")). Brisson explained that she marked "N/A" next to the "Access to Legal Materials" component that states "The facility supplements Attachment A materials with Lexis Nexis law library," because "the facility had a similar electronic database that they were using called Westlaw and it complied with the intent of the standard." (Pls.' Exh. 17 (Brisson Depo. at 51:22–52:7)). Brisson also noted that the facility agreed to provide any additional immigration law materials that ICE supplied to them. (*Id.* at 53:4–7). She said she assigned an overall rating of "acceptable" at the end of the checklist to "Access to Legal Materials" because "[t]he facility was ... complying with the intent of the standards and [was] willing to make any changes ... necessary in order to fully comply with our standards." (*Id.* at 54:21–24).

Having reviewed the evidence submitted by both parties, the court concludes that the methodologies employed by all of ICE, the ABA, and the UNHCR have limitations; these limitations are inherent, however, in any review process that relies on myriad individual reviewers to observe and evaluate conditions at more than two hundred facilities. All of the reviews—by ICE, the ABA, or the UNHCR—provide some insight into conditions at the detention facilities. Although cognizant of the limitations on their accuracy, the court concludes that, in combination, they provide the best evidence available regarding the government's compliance with the detention standards that are relevant to the *Orantes* injunction.

### c. Law Libraries And Access To Legal Materials

The *Orantes* injunction states: "Defendants shall provide detained class members with those legal materials regarding immigration matters which are currently available in English and Spanish, and should work in conjunction with counsel for plaintiffs to produce additional materials in Spanish. Detention center law libraries should be sufficiently accessible to detainees."[113] This provision was framed to address Judge Kenyon's findings that the INS "acted in bad faith by failing to respond to offers to provide ... legal rights materials in Spanish to be placed in the libraries at several detention centers"; that detention facilities lacked comprehensive law libraries; and that writing materials and implements were not always readily available to detainees. *Orantes II*, 685 F.Supp. at 1501–02.

ICE facility reviews, ABA reports, and UNHCR reports document the following problems, representing 20 violations at 16 different detention facilities:

- There was no law library at one detention facility. Detainees at the facility were required to request information from the legal department, which forwarded the requested material.[114]
- Four detention facilities did not maintain the full compendium of law books listed in the detention standard's Supplement A, i.e., statutes, regulations, treatises, and practice guidelines related to immigration, habeas petitions, civil procedure, asylum claims, criminal procedure, and legal research.[115] Of the four facilities, one did not house any detainees.[116]
- Two facilities failed to supplement legal materials with Lexis Nexis electronic databases;[117] six others had outdated, missing, or defaced legal materials.[118]
- Three facilities permitted detainees to spend less than five hours in the law library per week.[119]
- Two law libraries lacked typewriters and computers.[120] A third did not have typewriters, writing implements, or paper.[121] Another law library had no computers and only one typewriter, which was often nonfunctional.[122]

113. *Orantes* Injunction, ¶ 9.

114. Pls.' Exh. 19 at D07267–68. Plaintiffs also identified one facility where detainees in administrative and/or disciplinary segregation were denied access to law libraries. (Pls.' Exh. at D07412–13). In two other facilities, segregated detainees must request law materials, which are then delivered to them. (Pls.' Exh. at D05278–81; D04714).

115. Pls.' Exh. 19 at D04240–41; D04518–19; D05649, 05659; D06437–40. See also Mot. at Exh. L (Supplement A).

116. Pls.' Exh. 19 at D5659.

117. Pls.' Exh. 19 at D02034; D02753.

118. Pls.' Exh. 19 at D04095–96; D04365–74; D05327–30; D07268; D017402–16.

119. Pls.' Exh. 19 at D04002; D04518–19; D05830. Plaintiffs also note that there are two facilities where detainees must forego recreation time in order to use the law library. (Pls.' Exh. 19 at D008348–49; D008566).

120. Pls.' Exh. 19 at D02348; D04177–78.

121. Pls.' Exh. 19 at D004368.

122. Pls.' Exh. 19 at D009144. Plaintiffs identified one facility where detainees were charged for photocopies (Pls.' Exh. 19 at D018814) and a second where the librarian made one free copy of any document requested by a detainee, but charged $.10 for each additional copy (Pls.' Exh. at D017522–32). A detainee at another facility reported that he did not have access to a typewriter, pens, paper, or other supplies without paying for them, "although he sometimes ask[ed] to borrow a pen." (Pls.' Exh. 19 at D008593). A detainee at another facility reported that "in order to get photocopies for his case, he sent a letter to a friend on the 'outside' with the

#### d. Group Legal Presentations

In 1991, Judge Kenyon modified the *Orantes* injunction to add four conditions that apply solely to the Port Isabel Service Processing Center in Port Isabel, Texas. Among these is one that requires group legal presentations: "The group legal rights presentations currently taking place [at Port Isabel] should continue in order to remedy the difficulties [detainees experience] contacting counsel and the problems with receipt of legal rights materials. These presentations may be replaced by a video approved by counsel for plaintiffs or by the Court. Once again, the Court wishes to reiterate its hope that all parties can cooperate in the creation of a complete, yet comprehensible video." [123]

The ICE detention standard on "Group Presentations on Legal Rights" permits and encourages facilities to host presentations on U.S. immigration law and procedures when they receive requests from attorneys or legal representatives interested in providing such presentations. Although plaintiffs note that a number of facilities do not host presentations, and three prohibit presentations altogether,[124] the Port Isabel facility is not among them. Consequently, plaintiffs' evidence does not show non-compliance with this aspect of the injunction.

#### e. Telephone Access

Judge Kenyon found that detainees' access to telephones was severely restricted by time limitations, lack of functioning telephones, and/or restrictive INS practices. *Orantes II*, 685 F.Supp. at 1502. He also found that detained Salvadorans had difficulty reaching attorneys and relatives using "collect only" telephones. *Id.* To remedy these problems, the *Orantes* injunction mandates that the government "provide class members with access to telephones during proceedings." [125] It also requires that the government "provide at least one telephone per twenty-five (25) detainees at detention centers," and "ensure the privacy of attorney-client communications, through the use of privacy panels between telephones or other effective means." [126]

The ICE detention standard on "Telephone Access" requires that facilities provide detainees with "reasonable and equitable" telephone access.[127] As evidence that detainees continue to have difficulty accessing telephones despite the injunction's directives, plaintiffs cite the following from the ICE reviews, ABA reports, and UNHCR findings: [128]

- Two facilities did not provide at least one telephone per 25 detainees.[129]
- Telephones at one facility were not regularly inspected by staff to ensure

---

relevant citations and had the cases and statutes sent to him." Apparently, detainees at this facility must ask the librarian to make photocopies for them. Because the photocopier is located outside the library and because the librarian may not leave detainees unattended while they are in the library, detainees are effectively denied use of the photocopier. (Pls.' Exh. 19 at D017392).

**123.** *Orantes* Injunction, ¶ 12.

**124.** Opp. at 24:20–25:5.

**125.** *Orantes* Injunction, ¶ 4.

**126.** *Id.*, ¶ 7(e).

**127.** Mot., Exh. K.

**128.** Plaintiff's opposition referenced additional violations, but plaintiffs did not include the referenced Bates-numbered pages in their exhibits. As a result, the court cannot consider them in its analysis.

**129.** Pls.' Exh. 21 at D011420, 11456; D010338. Plaintiffs also identified several facilities where telephone access policies were not posted in housing areas and/or not fully explained in detainee handbooks. (See Opp. at 25–26). Although posting access policies and explaining them in handbooks are required by the detention standard on telephone access, they are not addressed in the *Orantes* injunction. Failure to post the access policies is therefore not directly relevant to the court's inquiry.

that they were in good working order. Telephones at one facility were out of service for extended periods of time. Detainees at another facility complained that telephones often did not work. Phone access codes did not work at one facility. The phone system at another facility went down for as much as 24 hours at a time, and calls were sometimes abruptly cut off.[130]

● At one facility, detainees (or their attorneys) must make a special request for privacy during telephone calls.[131] There was no privacy altogether at four facilities.[132]

These statistics represent violations at 11 detention centers, only 6 of which were identified in ICE facility reviews. The reviews documented related problems as well, including time restrictions on telephone use, lack of free calls to legal service providers, and telephones that permit collect calls only.[133] Although Judge Kenyon heard evidence regarding similar problems during the *Orantes* trial, he did not man-

130. Pls.' Exh. 21 at D011346; D013848; D008678; D017665.

131. Pls.' Exh. 21 at D08641–42. At one facility, telephone calls are private if they are arranged through a case worker. (Pls.' Exh. 21 at D07023).

132. Pls.' Exh. 21 at D08484; D12166; D08565; D017408. In addition, various ABA and UNHCR reports noted the following complaints regarding telephone privacy: One facility did not maintain privacy barriers between telephones located in housing areas (Pls.' Exh. 21 at D04241). An ABA report opined that "privacy may be compromised" because telephones are located close to the television and sitting area for detainees. (Pls.' Exh. 21 at D08260). At another facility, ABA reviewers observed that there were privacy partitions between telephones, but expressed concern that guards could potentially overhear telephone conversations because the telephones were located just 10 feet away from the guard area. (Pls.' Exh. 21 at D08437). Staff members at one facility told ABA reviewers that detainees had privacy during telephone conversations; some detainees, however, expressed concern about the lack of privacy and reported that fights had erupted among detainees who tried to silence one another so they could converse on the telephone. (Pls.' Exh. 21 at D08417, 8530). Still another ABA report found that telephone conversations were "not particularly private" because detainees could be overheard by other detainees and by staff members. (Pls.' Exh. 21 at D08588). One delegation reported that telephone conversations were private so long as no one else was around. (Pls.' Exh. 21 at D05072). At another facility, ABA reviewers concluded that telephone conversations were not private given the telephones' proximity to other detainees. (Pls.' Exh. 21 at D018822–23). Women detainees at yet another facility complained about lack of privacy during telephone calls. (Pls.' Exh. 21 at D18819).

133. Plaintiffs cite the following problems as examples: facilities in which inmates were permitted to make only collect calls (Pls.' Exh. 21 at D17558; D08239; D08395–96; D17377); in which staff members placed a 15–minute time limit on telephone calls (Pls.' Exh. 21 at D08640; D08368; D16139); in which detainees were permitted to make only one free call during their first four days at the facility (Pls.' Exh. 21 at D15871); in which detainees were not allowed to make free calls to consulates, immigration courts, and/or legal service providers (Pls.' Exh. 21 at D17408; D17383; D11700; D16010; D08491; D08588; D16289; D05952; D13905; D17408; D18818–19); in which indigent detainees were limited to one legal call per day (Pls.' Exh. 21 at D08223–24, 08226); and in which detainees were limited to two 30–minute attorney calls per month (Pls.' Exh. 21 at D08347). Detainees at one facility reported that requests to make free calls to immigration courts, consulates, and/or pro bono legal services providers took up to one month to process. (Pls.' Exh. 21 at D18807–08). ABA and UNHCR delegations also reported isolated complaints by detainees who could not receive telephone calls or messages from their attorneys (Pls.' Exh. 21 at D17361), and by detainees who reported problems contacting their attorneys or consulates (Pls.' Exh. 21 at D16137–42; D08696).

date specific changes to address these issues in the injunction.

### f. Visitation

The *Orantes* injunction includes two provisions regarding visitation, both of which address Judge Kenyon's concern that restricted visitation hours "severely limit the ability of attorneys and paralegals to conduct interviews with their clients." *Orantes II*, 685 F.Supp. at 1501. Paragraph 7(c) of the injunction states: "Defendants shall allow paralegal assistants working under the supervision of counsel to have access to class members even though the paralegals are unaccompanied by counsel." Paragraph 7(d) provides that "[d]efendants shall allow counsel or paralegals working under the supervision of counsel reasonable access to class members between the hours of 9:00 a.m. and 9:30 p.m., excluding such time as is necessary for reasonable security procedures. Detainees should be given the option to meet with their legal representatives during meal hours."

The ICE detention standard on "Visitation" requires that facilities permit legal visits seven days a week for at least eight hours a day on weekdays and four hours a day on weekends and holidays. To ensure that attorney consultations are private, facilities must provide private rooms for legal visits; no auditory supervision is allowed during the visits.[134]

Plaintiffs reviewed the ABA reports and ICE facility reviews related to this detention standard and identified various deficiencies at several facilities, including restrictions on visitation by family members and health care professionals, failure to post visitation hours, and failure to include attorney visitation hours in detainee handbooks.[135] The only relevant deficiencies, however, are these 10 violations:

- Two facilities permitted legal visitation on weekdays, but required approval before legal visits could occur on weekends.[136]
- An ABA delegation reported "potentially problematic attorney visitation hours" at one facility.[137]
- One facility in Puerto Rico lacked a private attorney visitation area. This deficiency was reported on two separate visits in March 2004 and May 2005.[138]
- Four facilities did not permit detainees to continue attorney meetings through scheduled meal periods.[139] A fifth facility required prior approval before a detainee could meet with an attorney during meal periods.[140]

### g. Correspondence, Mail, Funds And Personal Property

The detention standards on "Correspondence and Mail" and "Funds and Personal Property" encompass areas addressed in two separate provisions of the *Orantes* injunction. Paragraph 2(a) requires that the government permit class members to retain copies of the *Orantes* advisals and the free legal services list they received when processed. Paragraph 8 states: "Defen-

---

134. Mot., Exh. J.

135. Pls.' Exh. 22 at D004949; D006448; D007716; D009203; D009409; D009456; D010101; D010372; D011313, 11348; D005440; D007117; D008491; D006189, 6222; D001502; D004512, 5440, 13773; D13947; D004321; D007276, 7288, 7472, 7484; D009421; D010772; D008237–38; D010123; D005424.

136. Pls.' Exh. 22 at D004023; D015864–73.

137. Pls.' Exh. 22 at D017383.

138. Pls.' Exh. 22 at D008662, D10746, D010772, D012579, D012609.

139. Pls.' Exh. 22 at D02890; D04447; D08364; D08321.

140. Pls.' Exh. 22 at D14010.

dants shall permit detained class members to receive and possess legal materials explaining United States immigration law and procedure, and any other written materials unless possession of such materials would conflict with the maintenance of institutional security." These provisions were based on Judge Kenyon's finding that INS officials sometimes confiscated legal materials and legal forms that detainees received from their lawyers or from organizations that represented detainees. *Orantes II*, 685 F.Supp. at 1501.

Plaintiffs cite a number of violations of the detention standards on "Mail and Correspondence" and "Personal Property." ABA and ICE facility reviews documented instances in which staff members opened and inspected incoming general correspondence without the detainee present, failed to notify senders and/or addressees when they rejected or censored incoming or outgoing mail, and failed to inform detainees of their mail and correspondence policies.[141] They also identified isolated facilities that prohibited visitors from leaving personal property for detainees, failed to inform detainees of policies regarding personal property, or lacked policies for managing detainees' claims of lost, damaged, or forgotten property.[142] Of the violations reported, three—all of which were identified by ICE facility reviews—tend to show non-compliance with the provisions of the *Orantes* injunction and/or the existence of conditions resembling those that led Judge Kenyon to enter the injunction: (1) one facility did not permit visitors to leave personal property for detainees; (2) a second did not permit detainees to retain personal property "per policy"; and (3) a

third did not permit detainees in administrative segregation to retain personal property.[143] None of the identified violations pertains to the withholding or confiscation of legal materials, however.

### h. Hold Rooms

Hold rooms at detention facilities are used for "temporary detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of the facility."[144] Plaintiffs argue that the facility reviews reflect "numerous deficiencies that might persuade class members to relinquish their claims for relief and depart."[145] The government counters that conditions in hold rooms are irrelevant to the *Orantes* directive that the government not use "threats, misrepresentation, subterfuge or other forms of coercion, or in any other way attempt to persuade or dissuade class members when informing them of the availability of voluntary departure."[146] This is because the government asserts that detention facility hold rooms are not used to process aliens, and it is during processing that aliens are told about the option of voluntary departure.[147] Plaintiffs present no contrary evidence, and the court has no reason to doubt the government's representation.

As the court explained in its order granting plaintiffs discovery concerning the hold room standard, however, compliance with the hold room standard *is* relevant in determining whether DHS practices related to the transfer of detainees from point of arrest to remote detention facilities serve to isolate the detainees and increase the coercive nature of the atmosphere they confront. Judge Kenyon cited

---

141. Opp. at 32–33.

142. *Id.* at 33–34.

143. Pls.' Exh. 26 at D01831; D06026; D07687.

144. Pls.' Exh. 27.

145. Opp. at 34:13–14.

146. *Orantes* Injunction, ¶ 1.

147. Reply at 45:20–22.

such practices in his opinion; whether they continue today is relevant in assessing whether detention conditions have improved appreciably since the injunction was entered in 1988. See *Orantes II,* 685 F.Supp. at 1500 ("Class members, where transferred, have been deprived of food and kept incommunicado for extended periods of time. It is common that INS deprives class members of address books and telephone numbers in the course of transfer, such that transfer serves to place them completely out of touch with friends and relatives who could assist them"); see also *id.* at 1501 ("Pressure by individual IDOs upon Salvadorans to return to El Salvador is augmented by the orientation presentation made by DSOs to newly arrived Salvadoran and Guatemalan detainees at Port Isabel, who are isolated and quarantined until they have had a medical examination. They are segregated from the regular detainee population in Building 39 where they receive an orientation").

Plaintiffs' review of the ABA, UNHCR and ICE reports identified the following issues that were reported at 12 different detention centers:

- Records at one facility showed that detainees in hold rooms were not given food during stays of six or more hours, although the reviewer believed these incidences reflected poor record keeping rather than a failure to provide meals, i.e., that the meals were provided but not logged.[148]

- Detainees at five facilities were placed in hold rooms for more than the 12 hours permitted by the detention standard. There was no enforcement of the time restriction at a sixth facility.[149]

- Males and females were not adequately segregated in three facilities.[150]

- Hygiene deficiencies were recorded at two facilities. In the first, the reviewer reported that "conditions were terrible. There was no toilet paper, no facilities for a detainee to wash [his] hands, and feces were smeared on the walls of the room."[151] The facility's hold room did not have soap, cups, or toilet paper; due to lack of seating, inmates were lying on the floor at the time of inspection.[152] At the other facility, UNHCR visitors found a hold room that was "completely bare, with only a small grate on the floor that detainees [had to] use as a toilet."[153]

**i. Administrative Segregation And Disciplinary Segregation**

Judge Kenyon found that class members were often placed in administrative segregation, or solitary confinement without a hearing. See *Orantes II,* 685 F.Supp. at 1502 ("detainees facing solitary confinement for disciplinary purposes in the El Centro and El Paso Service Processing Centers did not receive advance notice of the charges, the opportunity to present oral testimony at a hearing, the opportunity to confront and cross-examine adverse witnesses, or the opportunity to be represented by counsel or counsel substitute"). He concluded that the government used administrative segregation "to circumvent the portion of the preliminary injunction that provide[d] procedural protections for class members placed in solitary confine-

---

148. Pls.' Exh. 28 at D21998–22001.

149. Pls.' Exh. 28 at D021243–47; D021787–93; D021745–49; D021735–40; D021528–34; D021228–33.

150. Pls.' Exh. 28 at D021759–63; D021722–24; D021686–88.

151. Pls.' Exh. 28 at D021264.

152. Pls.' Exh. 28 at D021263–67.

153. Pls.' Exh. 28 at D21860.

ment for punitive reasons." *Id.* The corresponding remedy is found in paragraph 10 of the injunction, which states:

"Defendants shall not place any class member in solitary confinement for a period of more than 24 hours except upon good cause shown and unless said class member has been provided:

(a) Written notice of the charges in advance of the hearing;

(b) An opportunity to appear at a hearing before impartial fact-finders and to present witnesses and documentary evidence at the hearing prior to placement in solitary confinement; and

(c) A written statement of the reasons for any decision to discipline the class members.

These procedural protections shall apply whether the confinement is referred to as 'disciplinary' or 'administrative' segregation or by any other name."

To support its argument that the problems Judge Kenyon identified concerning solitary confinement no longer exist, the government cites the detention standards on "Special Management Unit (Administrative Segregation)" and "Special Management Unit (Disciplinary Segregation)." Plaintiffs reviewed facility reports regarding both standards, and identified one violation relevant to the injunction's prohibitions and Judge Kenyon's concerns. This violation occurred at the Bannock County Jail in Pocatello, Idaho, where detainees were given a copy of the initial written decision and justification for placing them in administrative segregation, but not of the determination following review of the decision by a supervisory officer.[154] Plaintiffs also identified situations in which detainees in administrative segregation were not provided the same level of visitation, telephone access, and law library access as detainees in the general population.[155]

### j. Conclusion Regarding Detention Conditions

There are 201 detention centers subject to the ICE detention standards.[156] The

---

154. Pls.' Exh. 29 at D009042.

155. Opp. at 36–37. At seven facilities, detainees in administrative and/or disciplinary segregation were given limited or no access to telephones. (Pls.' Exh. 21 at D13531; D13675; D08641; D07400; D07680; D01457; D07341). In addition, seven facilities denied visitation rights to segregated detainees. (Pls.' Exh. 22 at D17404; D02420; D13542; D02509; D01228, 04603, 04642; D13363; D05590, 13881). Two facilities did not permit personal or family visits, but allowed legal and religious visits. (Pls.' Exh. 22 at D02116; D01074, 04879, 04926). One facility authorized one visit per month for detainees who were segregated for more than 30 days. (Pls.' Exh. 22 at D05310, 13686).

156. Both parties submitted statistics regarding the percentage of facilities rated "acceptable" with respect to the various detention standards. These statistical submissions frame the matter quite differently. Plaintiffs, in a footnote in their opposition brief, state that "26 of 53(49%) facilities [for which the government produced complete facility reviews for both 2004 and 2005] had at least one Standard that was rated less than 'acceptable' in 2004, and 16 of those 26 facilities had at least one Standard that was rated less than 'acceptable' in 2005. In 2004, 46 Standards were rated less than 'acceptable' at the 53 facilities. In 2005, 11 of the Standards that were rated less than 'acceptable' were the same deficiencies found by reviewers in 2004." (Opp. at 20–21 n. 19).

The government, by contrast, submitted the declaration of Sheri R. Glaser, an attorney who conducted a similar statistical analysis of the 53 facilities. (Declaration of Sheri R. Glaser ("Glaser Decl.")). Glaser asserts that she reviewed ratings for the 17 detention standards originally produced by the government to plaintiffs. (*Id.*, ¶ 1). It appears therefore that her analysis omits ratings for the detention standard on Hold Rooms, reviews for which were produced following the court's October 13, 2006 order regarding plaintiffs' motion for reconsideration of Magistrate Judge Victor B. Kenton's discovery or-

facility reviews that the government produced relate to only a portion of these 201 detention centers. As the foregoing summary of the evidence reveals, the ABA, the UNHCR and ICE have documented a

significant number of violations relevant to the provisions of the *Orantes* injunction and/or the concerns that led to its issuance at detention centers for which reviews were produced.[157] Most notably, violations

der. Glaser noted that there were 1785 detention standards for which reviews were originally produced (17 detention standards × 53 facilities × 2 years), and that 1714 were rated "acceptable." (*Id.*, ¶ 2). Of the 71 standards rated less than "acceptable," according to Glaser, only 36 were related to the seventeen detention standards that the government believes are relevant to the *Orantes* injunction. (*Id.*, ¶ 3). Consequently, she concludes, there is only a 2 percent non-compliance rate with standards that are relevant to this proceeding. (*Id.*, ¶ 4).

Not surprisingly, the statistical conclusions the parties offer support their respective positions. While plaintiffs focus on whether any of 53 detention facilities has been rated deficient with respect to any of the 17 detention standards for which information has been produced, the government combines all 53 facilities and all of the detention standards to produce its non-compliance number. As is oft and famously said, "[t]here are three kinds of lies—lies, damned lies and statistics." Despite their disparate approaches, neither plaintiffs' nor defendants' statistical summary of the facility reviews provides the court with much useful data. A facility's "deficient" or "at-risk" rating on a particular detention standard is only marginally, if at all, related to the court's inquiry, *unless* it was rated "deficient" or "at risk" *because of* a deficiency that is relevant to provisions of the *Orantes* injunction. Knowing that 49 percent of 53 facilities were rated less than "acceptable" in at least one detention standard, or that only two percent of 1785 detention standards were rated less than "acceptable," without further information regarding the reasons for the deficient ratings, is not of assistance in determining whether the *Orantes* injunction ought to stay in place.

157. A month after the hearing on this motion, plaintiffs submitted a copy of a newly-released report by the DHS Office of Inspector General. This report sets forth conclusions and recommendations by the OIG based on its audit of compliance with selected detention standards at five detention facilities: (1) Berks County Prison (BCP), Leesport, Pennsylvania; (2) Corrections Corporation of

America (CCA) Facility, San Diego, California; (3) Hudson County Correction Center (HCCC), Kearny, New Jersey; (4) Krome Service Processing Center (KSPC), Miami, Florida; and (5) Passaic County Jail (PCJ), Paterson, New Jersey. (OIG Report at 1). The court has reviewed the report and identified the following findings that are relevant to the inquiry at hand:

- Detainees at HCCC lacked Lexis Nexis access until January 2005, when officials installed two computers with Lexis Nexis software. At BCP, detainees did not have Lexis Nexis access during the entire month of March 2005 because officials did not realize that the software license had expired. At PCJ, detainees did not have access to any legal materials during November 2005 because the facility's license for the materials had expired. Legal materials were restored on December 1, 2005 after ICE provided the facility with an updated version of the *Immigration Case Law* library on disks. (OIG Report at 16–17).
- Two detainees at HCCC were placed in disciplinary segregation without a hearing in July 2005. They were subsequently found not guilty. The OIG's audit at PCJ revealed six instances in which detainees were placed in disciplinary segregation before a hearing was held. These detainees too were later found not guilty. (*OIG Report at* 16).
- On October 21, 2005, 4 of 11 telephones in the male visitation room at PCJ were not operational. A month later, 1 of the 11 telephones did not work. At CCA San Diego, 13 of 60 phones in the detainee visitor area were nonfunctional on April 19, 2005. (OIG Report at 24).
- Auditors noted privacy concerns with regard to the placement of telephones at BCP, HCCC, CCA San Diego, and PCJ. (OIG Report at 24). They also encountered substantial problems placing free telephone calls to consulates and pro bono legal services at PCJ. (OIG Report at 25).

Following completion of the review, ICE removed all immigration detainees from PCJ (OIG Report at 38), where a majority of the

of the provisions regarding law libraries and access to legal materials were reported at 16 facilities. In addition, 11 detention centers reported violations of provisions regarding telephone access, while another 9 reported violations of provisions requiring adequate access to attorneys. In concluding that the number of violations is significant, the court gives considerable weight to evidence suggesting that the facility reviews have understated—perhaps severely—violations of the standards at the various detention centers. The ABA and UNHCR reports, for example, routinely identify deficiencies that are not captured by ICE facility reviewers in their annual inspections. Indeed, in a December 2006 report, the DHS Office of Inspector General ("OIG") publicly questioned the "thoroughness" of the periodic facility reviews. The OIG noted that its own review of five detention centers—all of which were rated "acceptable" by ICE reviewers—revealed "instances of non-compliance ... that were not identified during the ICE annual inspection of the detention facilities."[158] The OIG's findings regarding the Passaic County Jail

were sufficiently serious that they caused ICE to move *all* immigration detainees housed at that facility.[159] Yet, the Passaic County Jail received an "acceptable" rating during its annual ICE review.[160] The totality of the evidence thus suggests that the incidence of non-compliance is higher, perhaps substantially higher, than that reported by ICE facility reviewers.

To obtain relief from the sweeping type of injunction Judge Kenyon issued, of course, the case law does not require that the government show not only that it has implemented standards to address the problems that led to issuance of the injunction, but also that it has a 100 percent record of complying with those standards. Rather, the Supreme Court has stated that, coupled with the elimination, "to the extent practicable," of the underlying problem the injunction sought to address, good faith efforts to comply are sufficient to justify dissolution of a reform decree that imposes judicial oversight on an institution properly governed by a branch of government other than the federal judiciary. See *Dowell,* 498 U.S. at 249, 111 S.Ct. 630 (on remand, "[t]he District Court

---

violations (both those relevant and not relevant to the *Orantes* injunction) occurred. The OIG noted that ICE took "immediate action to address many of [its] concerns." (OIG Report at 1). It stated: "We made 13 recommendations addressing the areas of non-compliance identified. ICE partially or fully concurred with 9 of the 13 recommendations and the proposed actions to implement the 9 recommendations are adequate." (OIG Report at 1).

It appears that some of the deficiencies reported by the OIG duplicate the problems noted in the facility reviews submitted to the court. While the court has not systematically catalogued the detention facility reviews in its possession to determine the level of duplication, it is aware that deficiencies at PCJ figure prominently in the facility reviews on which plaintiffs rely. The most troubling aspect of the OIG report lies not in its report of specific deficiencies, however, but in its observation

that the review "identified instances of non-compliance regarding health care and general conditions of confinement that were not identified during the ICE annual inspection of the detention facilities." (OIG Report at 36). The court understands that ICE manages 201 detention facilities, some 300 field reviewers, and 18,000 to 20,000 detainees. (Evans Depo. at 23:10–11, 55:24–25). The scope of the DSCU's task necessarily prevents perfection. Nonetheless, in reaching a conclusion regarding current detention conditions, the court takes OIG's conclusion into account in assessing the comprehensiveness of the facility reviews that form a significant part of the evidence in the record.

158. OIG Report at 36.

159. *Id.* at 38.

160. *Id.* at 36.

should address itself to whether the Board has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable").

Nonetheless, the court cannot conclude that the problems addressed by the injunction have been eliminated "to the extent practicable," given evidence that at detention facilities for which reports were produced there have been a significant number of violations of critical provisions of the injunction dealing with detainees' access to legal materials, telephone use, and attorney visits.[161] This substantial evidence of *non-compliance* persuades the court that detention center conditions are not so changed as to warrant dissolution of paragraphs 1, 3–9 [162] and 13–15 [163] of the *Orantes* injunction. By contrast, the evidence shows only isolated (or no) violations of paragraphs 10 and 12 of the injunction, i.e., provisions regarding administrative segregation and legal presentations. Accordingly, the court finds it appropriate to dissolve paragraphs 10 and 12 of the *Orantes* injunction.[164]

The court is cognizant of the principle that the legislative and executive branches possess plenary authority over immigration. See *Mathews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976) ("For reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Govern-

**161.** See *Orantes* Injunction, ¶¶ 3–9, 14–15.

**162.** Paragraph 1 enjoins defendants from "employ[ing] threats, misrepresentation, subterfuge or other forms of coercion, or in any *other way attempt[ing] to persuade or dissuade* class members when informing them of the availability of voluntary departure...." (*Orantes* Injunction, ¶ 1.) Paragraph 3 of the injunction restrains defendants from "advis[ing], encourag[ing], or persuad[ing][a] class member to change his or her decision" to apply for asylum. None of the evidence before the court demonstrates that the detention standards promulgated by the government have obviated the need for these provisions of the injunction. Consequently, the court declines to dissolve them. It notes, in fact, that evidence of non-compliance with the Hold Room standard suggests that various forms of coercion that concerned Judge Kenyon remain potentially extant today. See, e.g., *Orantes II*, 685 F.Supp. at 1500 ("Class members, where transferred, have been deprived of food and kept incommunicado for extended periods of time. It is common that INS deprives class members of address books and telephone numbers in the course of transfer, such that transfer serves to place them completely out of touch with friends and relatives who could assist them"); see also *id.* at 1501 ("Pressure by individual IDOs upon Salvadorans to return to El Salvador is augment-

ed by the orientation presentation made by DSOs to newly arrived Salvadoran and Guatemalan detainees at Port Isabel, who are isolated and quarantined until they have had a medical examination. They are segregated from the regular detainee population in Building 39 where they receive an orientation").

**163.** Paragraph 13 requires that ICE officers and Burns or other private security guards working at the Port Isabel processing center receive training regarding the requirements of the injunction. Since certain provisions of the injunction remain in force, this provision too must remain in force.

**164.** Paragraph 11 of the injunction (the "transfer provision") prohibits the government from transferring class members who are unrepresented by counsel from the district of apprehension for at least seven days. In an order issued October 11, 2006, the court added language to paragraph 11 to clarify that it does not prevent the transfer of individuals subject to final orders of removal entered as a result of expedited removal proceedings. (See Docket No. 783). In doing so, the court addressed the government's primary objection to paragraph 11. As the parties have adduced no evidence that warrants dissolution of paragraph 11, as modified, the court declines to enter such an order at this time.

ment"); see also *Lem Moon Sing v. United States,* 158 U.S. 538, 547, 15 S.Ct. 967, 39 L.Ed. 1082 (1895) ("The power of Congress to exclude aliens altogether from the United States, or to prescribe the terms and conditions upon which they may come into this country, and to have its declared policy in that regard enforced exclusively through executive officers, without judicial intervention, is settled by our previous adjudications"); *Ventura–Escamilla v. Immigration and Naturalization Service,* 647 F.2d 28, 30 (9th Cir.1981) (noting that Justice Harlan's statement "still clearly expresses the Court's position"). This does not immunize the DHS from injunctions or judicial oversight, however, as Judge Kenyon's order and the Ninth Circuit decision affirming it demonstrate. See also *La-Duke,* 762 F.2d at 1324 (entering an injunction against the INS while noting that "[e]nforcement of the nation's immigration laws has been delegated by Congress to the Executive Branch. Nonetheless, the federal judiciary has been vested with the ultimate authority to determine the constitutionality of the actions of the other branches of the federal government. While the co-equal branches of the federal government are entitled to the widest latitude in the dispatch of [their] own internal affairs, the executive branch has no discretion with which to violate constitutional rights" (citations omitted, alterations original)); *International Molders' & Allied Workers' Local Union No. 164 v. Nelson,* 799 F.2d 547, 551–52 (9th Cir.1986) ("INS is correct that courts are reluctant to enjoin law enforcement agencies entitled to 'the widest latitude in the "dispatch of [their] own internal affairs," ' ... However, the INS has 'no discretion with which to violate constitutional rights' ").

Had the record revealed that maintenance of the injunction was no longer required to fulfill the purposes for which it was entered, the court would not have hesitated to dissolve it. For the reasons stated, however, the court concludes the government has not established that promulgation of the ICE detention standards and the end of the Salvadoran civil war constitute sufficiently changed circumstances that all provisions of the *Orantes* injunction related to detention conditions should be dissolved. Documented levels of non-compliance with relevant standards indicate that the injunction remains necessary to ensure that Salvadorans are able to exercise their right to apply for asylum freely and intelligently.

## III. CONCLUSION

For the reasons stated, the court grants the government's motion to dissolve paragraphs 10 and 12 of the *Orantes* injunction. It denies the motion in all other respects.